Consolidated Nos. 24-5019 and 25-1702
[NO. 2:21-cr-00045-JCC, USDC, W.D. Washington]

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SUMIT GARG,

Defendant-Appellant.

## ANSWERING BRIEF OF UNITED STATES

Appeal from the United States District Court
for the Western District of Washington at Seattle
The Honorable John C. Coughenour
United States District Judge

TANIA M. CULBERTSON
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: 206-553-7970

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................v

ISSUES ON APPEAL ..............................................................................1

I.    Did the district court abuse its discretion in not ruling on Garg's untimely suppression motion? If so, was Garg's warrantless arrest reasonable under the Fourth Amendment, or, alternatively, was admission of evidence from that arrest harmless considering the overwhelming other evidence of his guilt? ..............................................................................................1

II.   Has Garg failed to show that after he exercised his *Faretta* rights, he was denied a meaningful opportunity to represent himself? ...........................................................................................1

III.  Did the district court clearly err in finding that Garg was sufficiently advised of his sentencing exposure and err in concluding there was no reasonable probability that any additional advice from counsel would have led Garg to accept a 48-month plea offer? ....................................................................1

IV.  Was the jury correctly instructed on the elements of cyberstalking? ....................................................................................1

V.   Did the district court abuse its discretion in not ruling on Garg's untimely motion to dismiss Count 8? If so, did the indictment sufficiently allege the necessary elements for Count 8? ...................................................................................................1

JURISDICTIONAL STATEMENT .........................................................1

DEFENDANT'S BAIL STATUS ...............................................................1

STATEMENT OF THE CASE ................................................................2

I.  Trial evidence ................................................................2

    A.  Garg and his wife share an apartment with Melissa Hutchins in Seattle....................................2

    B.  Hutchins receives strange calls, texts, and emails ..............5

    C.  Garg's harassment grows exponentially and progresses to graphic threats..................................8

    D.  Garg graduates to physical stalking, stages a break-in at his home, and is arrested twice .......................19

    E.  Garg fires three attorneys and one standby counsel, obsessively litigates his federal case, represents himself during a ten-day trial, and is convicted ..................................................................34

SUMMARY OF ARGUMENT ....................................................39

ARGUMENT ..............................................................................43

I.  Evidence from Garg's phone was not suppressible; regardless, its admission was harmless considering the overwhelming evidence of Garg's guilt ..........................................43

    A.  Standard of review ................................................43

    B.  Procedural background ..........................................43

    C.  The district court did not reversibly err in admitting evidence from Garg's phone ................................48

        1.  The district court did not abuse its discretion in refusing to reopen the pretrial motions deadline .......................................48

ii

2. Garg's probable-cause arrest was reasonable considering his months-long manipulation of law enforcement and his responsibility for the ruse ............................... 51

3. Evidence from Garg's phone was harmless beyond a reasonable doubt ........................... 55

II. Garg's Sixth Amendment right to self-representation was not violated ................................................................. 66

A. Standard of review .............................................. 66

B. Garg was given a fair chance to present his case ................ 66

1. Garg misrepresents the district court's responses to his filings ................................ 67

2. The court did not prevent Garg from conferring with a computer expert ........................... 76

III. The district court did not err in denying Garg's motion to reinstate the government's plea offer ....................... 82

A. Standard of review and legal standard ................. 82

B. The record does not support Garg's claim—raised only after he saw the strength of the digital evidence—that he was misadvised, nor shows a reasonable probability of a different outcome .................... 83

1. The course of plea negotiations .................. 83

2. Garg's later representations about Camiel's advice ......................................................... 87

3. The district court did not clearly err in its factual findings, and it correctly denied Garg's motion to reinstate the plea offer .................... 88

IV. The jury was correctly instructed on the cyberstalking counts ................................................................................ 95

    A. Standard of review ............................................................. 95

    B. Garg misunderstands *Counterman v. Colorado* and ignores this Court's binding caselaw on 18 U.S.C. §2261A(2) ............................................................. 96

V. Garg's challenge to Count 8 fails ................................................. 101

    A. Standard of review ............................................................. 101

    B. Garg's challenge to Count 8 was untimely and meritless ...................................................................... 102

CONCLUSION ............................................................................... 104

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

# TABLE OF AUTHORITIES

**Federal Cases**

*Armant v. Marquez,*
   772 F.2d 552 (9th Cir. 1985) .............................................................. 73

*Chapman v. California,*
   386 U.S. 18 (1967) ............................................................................. 43

*Counterman v. Colorado,*
   600 U.S. 66 (2023) ..................................................................... passim

*Davis v. Mississippi,*
   394 U.S. 721 (1969) ........................................................................... 64

*Hayes v. Florida,*
   470 U.S. 811 (1985) ........................................................................... 64

*Hill v. Lockhart,*
   474 U.S. 52 (1985) ............................................................................. 95

*Lafler v. Cooper,*
   566 U.S. 156 ...................................................................................... 82

*Lewis v. United States,*
   385 U.S. 206 (1966) ........................................................................... 52

*McKaskle v. Wiggins,*
   465 U.S. 168 (1984) ............................................................... 66, 67, 76

*Milton v. Morris,*
   767 F.2d 1443 (9th Cir. 1985) ...................................................... 73, 74

*Puckett v. United States,*
   556 U.S. 129 (2009) ...................................................................... 95, 96

*Sorrells v. United States*,
  287 U.S. 435 (1932) ................................................................ 51, 52

*Strickland v. Washington*,
  466 U.S. 668 (1984) ........................................................................ 93

*United States v. Alverez-Tejeda*,
  491 F.3d 1013 (9th Cir. 2007) ...................................................... 52

*United States v. Anderson*,
  472 F.3d 662 (9th Cir. 2006) ........................................................ 43

*United States v. Anekwu*,
  695 F.3d 967 (9th Cir. 2012) ..................................... 50, 90, 98, 103

*United States v. Bosse*,
  898 F.2d 113 (9th Cir. 1990) .................................................. 44, 54

*United States v. Bussell*,
  504 F.3d 956 (9th Cir. 2007) ........................................................ 90

*United States v. Crawford*,
  No. 23-2532, 2025 WL 1248825 (9th Cir. Apr. 30, 2025) ...... 97, 98, 103

*United States v. Ehmer*,
  87 F.4th 1073 (9th Cir. 2023) ..................................................... 100

*United States v. Engel*,
  968 F.3d 1046 (9th Cir. 2020) ............................................ 66, 67, 73

*United States v. Farias*,
  618 F.3d 1049 (9th Cir. 2010) ...................................................... 73

*United States v. Flewitt*,
  874 F.2d 669 (9th Cir. 1989) .................................................. 50, 66

*United States v. George*,
  883 F.2d 1407 (9th Cir. 1989) ...................................................... 69

*United States v. Ghanem,*
 993 F.3d 1113 (9th Cir. 2021) ........................................................... 49

*United States v. Gonzales,*
 749 F.2d 1329 (9th Cir. 1984) ........................................................... 50

*United States v. Gonzalez-Sandoval,*
 894 F.2d 1043 (9th Cir. 1990) ........................................................... 56

*United States v. Guerrero,*
 921 F.3d 895 (9th Cir. 2019) ............................................................. 49

*United States v. Gust,*
 405 F.3d 797 (9th Cir. 2005) ................................................. 89, 90, 91

*United States v. Harrison,*
 34 F.3d 886 (9th Cir. 1994) ............................................................... 56

*United States v. Hinkson,*
 585 F.3d 1247 (9th Cir. 2009) (en banc) ........................................... 49

*United States v. Isho,*
 No. 22-10150, 2024 WL 135247 (9th Cir. Jan. 10, 2024) ........... 99, 103

*United States v. Jaimez,*
 45 F.4th 1118 (9th Cir. 2022) ........................................................... 95

*United States v. Job,*
 871 F.3d 852 (9th Cir. 2017) ....................................................... 43, 56

*United States v. Kirst,*
 54 F.4th 610 (9th Cir. 2022) ............................................................. 95

*United States v. Merrill,*
 746 F.2d 458 (9th Cir. 1984) ....................................................... 66, 67

*United States v. Newman,*
   943 F.2d 1155 (9th Cir. 1991)......................................56

*United States v. Nixon,*
   418 U.S. 683 (1974)................................................68

*United States v. Oaxaca,*
   233 F.3d 1154 (9th Cir. 2000).....................................62

*United States v. Ortiz-Hernandez,*
   427 F.3d 567 (9th Cir. 2005)......................................64

*United States v. Osinger,*
   753 F.3d 939 (9th Cir. 2014)...................96, 97, 98, 99, 103

*United States v. Osorio-Arellanes,*
   112 F.4th 647 (9th Cir. 2024).....................................82

*United States v. Parga-Rosas,*
   238 F.3d 1209 (9th Cir. 2001).....................................64

*United States v. Phillips,*
   497 F.2d 1131 (9th Cir. 1974).....................................54

*United States v. Qazi,*
   975 F.3d 989 (9th Cir. 2020).....................................101

*United States v. Ramirez,*
   976 F.3d 946 (9th Cir. 2020)...........................51, 52, 54

*United States v. Rice,*
   776 F.3d 1021 (9th Cir. 2015).....................................72

*United States v. Sarno,*
   73 F.3d 1470 (9th Cir. 1995)...............................75, 76

*United States v. Shryock,*
   342 F.3d 948 (9th Cir. 2003)......................................62

*United States v. Steele,*
  733 F.3d 894 (9th Cir. 2013) ................................................................. 93

*United States v. Stoterau,*
  524 F.3d 988 (9th Cir. 2008) .......................................................... 63, 65

*United States v. Tekle,*
  329 F.3d 1108 (9th Cir. 2003) ................................................. 43, 49, 102

*Whalen v. McMullen,*
  907 F.3d 1139 (9th Cir. 2018) ......................................................... 52, 54

**Federal Statutes**

Title 18, United States Code
  Section 2261A(2) ...................................................................... passim
  Section 2261A(2)(A) .......................................................................... 104

**Federal Rules**

Federal Rules of Appellate Procedure,
  Rule 28(a)(8)(A) .................................................................................. 63

Federal Rules of Criminal Procedure,
  Rule 11(c)(1) ........................................................................................ 92
  Rule 12 .................................................................................... passim
  Rule 12(b)(3) ..................................................................................... 102
  Rule 12(b)(3)(C) .................................................................................. 48
  Rule 12(c)(1) ..................................................................................... 102
  Rule 12(c)(2) ....................................................................................... 49
  Rule 12(c)(3) .................................................................. 49, 50, 72, 75
  Rule 17(c) ............................................................................................ 68
  Rule 30(d) ............................................................................................ 95

**Other Authorities**

Ninth Circuit Rules

Rule 27-13(a) ...................................................................59

Rule 30-14 (Advisory Committee Note (e)) .......................................59

## ISSUES ON APPEAL

I.   Did the district court abuse its discretion in not ruling on Garg's untimely suppression motion? If so, was Garg's warrantless arrest reasonable under the Fourth Amendment, or, alternatively, was admission of evidence from that arrest harmless considering the overwhelming other evidence of his guilt?

II.  Has Garg failed to show that after he exercised his *Faretta* rights, he was denied a meaningful opportunity to represent himself?

III. Did the district court clearly err in finding that Garg was sufficiently advised of his sentencing exposure and err in concluding there was no reasonable probability that any additional advice from counsel would have led Garg to accept a 48-month plea offer?

IV.  Was the jury correctly instructed on the elements of cyberstalking?

V.   Did the district court abuse its discretion in not ruling on Garg's untimely motion to dismiss Count 8? If so, did the indictment sufficiently allege the necessary elements for Count 8?

## JURISDICTIONAL STATEMENT

The United States agrees with Garg's statement of jurisdiction.

## DEFENDANT'S BAIL STATUS

Garg is serving his 9-year prison sentence. His projected release date is April 24, 2028.

1

## STATEMENT OF THE CASE

### I.    Trial evidence

#### A.    *Garg and his wife share an apartment with Melissa Hutchins in Seattle*

In September 2018, Melissa Hutchins moved to Seattle to work for Expedia. 1-SER-88-90. She was new to Seattle and used Facebook to find a roommate. 1-SER-90. She found Lindsay Hefton, who was moving to work as a cyber-security professional at Amazon. 1-SER-91; 4-SER-857-58. Hefton told Hutchins that she had a boyfriend (Sumit Garg) but that he wouldn't be moving to Seattle. 1-SER-91; 4-SER-858. In fact, Hefton was married to Garg, but kept that fact from Hutchins. 1-SER-92; 4-SER-859. Hutchins and Hefton moved in together in October 2018. 1-SER-92. Garg soon came to visit. 1-SER-92; 4-SER-859. Hefton then asked Hutchins if Garg could move in. 1-SER-93. Hutchins was uneasy, but she "didn't want to create a conflict" and agreed. 1-SER-93; 4-SER-859-60.

At first, the three got along, and at the end of January 2019 they took a trip together to Colorado. 1-SER-94-95.

 

6-SER-1543; 7-SER-1627. Although Hutchins enjoyed parts of the trip and posed for pictures at hot springs and while tubing, she began to feel uncomfortable because of Garg's "aggression" and his "yelling" when he would "get upset about something." 1-SER-96-98. The trip was "the initial red flag," and afterward Hutchins "tried to stay out of the apartment as much as possible." 1-SER-98, 185. Garg explained to Hutchins that he suffered from intermittent explosive disorder (IED). 1-SER-103.

Hutchins' discomfort grew as Garg began asking prying questions about her dating life. 1-SER-99. Hutchins kept a diary on her bedside table. 1-SER-100-01. Garg told Hefton that one day he "walked into

[Hutchins'] room," "picked [the diary] up off the floor" and read parts of it. 4-SER-863.



6-SER-1536. Garg's fingerprints were later found on the diary. 3-SER-646.

Disagreements between the roommates escalated over "little things." 1-SER-98. Garg and Hefton began disputing the rent they owed Hutchins, and at the end of June 2019 their disagreements came to a head; Garg became enraged during an argument in front of the apartment's leasing manager. 1-SER-103-04. Afterward, the leasing

manager advised Hutchins to immediately seek a protection order because "based on what she just saw," she "was scared for [Hutchins]." 1-SER-230. *See also id.* ("Don't go up—don't go up and change, don't go up and do anything. I would go right now."). Hutchins followed that advice, went to the courthouse to apply for the order, and then called her uncle Mike Zigler, a retired attorney who lived in Seattle. 1-SER-105-06; 2-SER-274-75. Zigler collected Hutchins, took her to the apartment to pack her essentials, and brought her to his condo. 1-SER-106-07; 2-SER-276. Hutchins did not pack her diary. 1-SER-107.

## B. *Hutchins receives strange calls, texts, and emails*

In July 2019, the temporary protection order Hutchins obtained was extended, and Garg's attorney proposed a settlement of Hutchins' action via a one-year civil no-contact order. 2-SER-277-78. Garg and Hutchins executed a settlement agreement on July 19. 2-SER-278.

Five weeks later, Garg's attorney emailed Zigler because Garg was applying for a job at Expedia and wanted to know which Seattle-area office Hutchins worked in so that he could apply to the other one. 2-SER-279; *see also* 4-SER-868. Zigler responded that Garg should withdraw his application because Hutchins worked in both offices and it was

5

inappropriate for Garg to apply considering the provisions of the no-contact order. 2-SER-279. Hutchins shared her concerns about Garg's application with her manager. 1-SER-108-09. Garg was not hired by Expedia and "assumed that he had been put on a black list." 4-SER-868.

Soon after, in early 2020, Hutchins started receiving frequent calls from unknown numbers. 1-SER-110. Sometimes she would hear "dead silence" and other times she would hear the same song with the lyrics "Are you happy now?" *Id*. She also started receiving text messages discussing "personal … details of [her] life" and "accusing [her] of filing a fake protection order." 1-SER-110-11. And she began receiving emails referencing her diary and threatening to disclose it (*see* 1-SER-111), like this one:

| From: | helloo gorgeous <helloogorgeousdiary@gmail.com> |
|---|---|
| Sent: | Saturday, January 25, 2020 10:15 PM |
| To: | hutcml76@gmail.com |
| Subject: | Re: Hello Gorgeous! |

Diary becomes public

Travis sex

Victor sex skype

Boss fantasies

Loneliness

6-SER-1548; *see also* 1-SER-114. Hutchins testified that Travis Bieber, referenced in the above email, was an ex-boyfriend whom she had never discussed with Garg or Hefton, but about whom she had written in her diary. 1-SER-115-16. Hutchins received 25-50 similar emails from diary-related email addresses. 1-SER-117.

Hutchins also started receiving unusual social-media communications, including notifications about accounts impersonating her. 1-SER-117-19. The profile picture of one LinkedIn impersonator account featured the photo of Hutchins taken at the hot springs in Colorado. *See* 6-SER-1546. Some of the social-media accounts claimed that Hutchins had affairs with married men and suffered from mental-health problems, and nonprofits that Hutchins volunteered with were contacted about those accusations. *See* 1-SER-124-27; 6-SER-1551. Fake social-media accounts also sprung up impersonating Bieber. 1-SER-121. Hutchins spent an "exorbitant amount of time" reporting the fake accounts and trying to have them taken down. 1-SER-124. In the spring of 2020, she contacted the police. 1-SER-127-28.

### C. Garg's harassment grows exponentially and progresses to graphic threats

As Garg's campaign of harassing messages grew, Hutchins learned that Garg and Hefton had begun reporting *her* for harassment based on email messages they were receiving. 1-SER-128. But those messages were sent by Garg from accounts he created impersonating Hutchins. 4-SER-887. In June 2020, Garg also made Hefton file a false police report claiming she had been followed by Hutchins. 4-SER-871-72. Hefton complied because she was afraid Garg would physically abuse her, which he had done since shortly after they married. 4-SER-874-75, 926; *see also* 4-SER-1017 (Garg had "ripped an earring out of [Hefton's] ear and then knocked [her] head against the bed"), 875 ("I knew I just had to do what he said … or he would get abusive"). At Garg's insistence, Hefton also filed a baseless civil suit against Hutchins. 1-SER-129-29, 2-SER-283.

Hutchins proceeded with seeking a permanent restraining order and hired Mark Blair to represent her. 1-SER-130; 2-SER-283. Meanwhile, the number of communications she was receiving was "continuing to increase …. Every day, it was a combination of texts, phone calls, e-mails, and just all throughout the day, it was never ending." 1-SER-130. The messages became more threatening, "directed

8

to raping [Hutchins], killing [her], much more violent threats." 1-SER-131.

| From: | mdwe8b+75wzaepfqf6h4@guerrillamail.com |
|---|---|
| Sent: | Thursday, September 24, 2020 12:59 PM |
| To: | hutcml76@gmail.com |
| Subject: | cravings |

just one good fuck is all you need

6-SER-1553. By this point, Hutchins and her boyfriend, Cesar Gonzalez, had moved to an apartment in a secure building called Tower 12. 1-SER-135; 2-SER-375. In the subject line of one email from that time, Garg made clear that he still knew their whereabouts:

| From: | Sumit Garg <sumitgargied91@gmail.com> |
|---|---|
| Sent: | Monday, October 5, 2020 8:35 AM |
| To: | hutcml76@gmail.com |
| Subject: | Re: https://tower12.com/ |

Keep working on that pussy. Can't wait

6-SER-1557.

9

As Hutchins was receiving the diary-related emails, Gonzalez began receiving harassing messages. 2-SER-373-75. Fake social-media accounts were created in Gonzalez's name. 2-SER-376. By July 2020, both were enduring a "non-stopping barrage of … texts, e-mails, fake accounts, over and over again"; Hutchins was "extremely upset," "stressed," and "having trouble sleeping" and focusing. 2-SER-377. Gonzalez, too, was stressed and had trouble focusing because it was "always waking up, e-mails and texts; going around the day, more texts, fake accounts." *Id.* The messages "started to have rape threats, they started to have like death threats" and it "was very scary." 2-SER-378.

By October 2020, Gonzalez was receiving hundreds of harassing emails a day (2-SER-380-81), some on his work account, like this one:

| From: | Victor H <victor32b85@gmail.com> |
| Sent: | Thursday, October 29, 2020 11:15 PM |
| To: | Travis Bieber <travisbieber61@gmail.com> |
| Cc: | cegonzalez@hotwire.com; hutcml76@gmail.com |
| Subject: | Re: Past boyfriend to another |

Melissa,

Who's dick gives you the most cravings Sumit, Travis, Cesar, Victor, David?

7-SER-1569. Gonzalez disclosed the emails to his manager and feared it "might affect [his] workplace." 2-SER-380. He also received emails threatening to raise "a domestic violence claim against" him, which was "very concerning" because such allegations could jeopardize his H-1B visa. 2-SER-386. Meanwhile, Hefton filed for a protection order against Gonzalez, claiming that he was harassing her, and Garg falsely reported that Gonzalez had put gun to his back. 2-SER-387-88, 455.

Garg also widened his harassment campaign. Between April 2020 and February 2021, Zigler received over 600 stalking emails (2-SER-284), like these:

| | |
|---|---|
| **From:** | Sumit Garg <sumitgargied90@gmail.com> |
| **Sent:** | Sunday, October 4, 2020 2:57 PM |
| **To:** | mzigler@mac.com |
| **Cc:** | hutcml76@gmail.com |
| **Subject:** | Re: I will bring you to your knees old man |

Your fuck buddy's diary has been sent to entire Expedia. Everyone will get a kick out of her sexual fantasies about victor's big cock, sexual cravings about travis, daddy issues, pussy licking, fucking while being tied to bed haha

7-SER-1679.

11

**From:** Sumit Garg <sumitqarg9o@gmail.com>
**Sent:** Thursday, December 3, 2020 8:48 PM
**To:** mzigler@mac.com
**Subject:** Old Motherfucker I'm coming

Old Motherfucker my man would soon end your misery.

7-SER-1680. Zigler viewed the above email as a death threat. 2-SER-294.

Zigler also received hang-up calls and texts, including this one:



7-SER-1565.[1] Some communications referenced more of Zigler's family members; indeed, some were copied on the messages. 7-SER-1681.

By October 2020, Mark Blair was also receiving harassing communications. 2-SER-493-94. He was also receiving false, negative reviews on Google. 2-SER-494-95. One email from December 2020 listed the names of Blair's family members, attached photos of his wife, brother, niece, and nephew, and said they "will pay for your insults against my lawyer today." 7-SER-1696; 2-SER-496-99. Another was more specific:

| | |
|---|---|
| **From:** | Sumit Garg <sumitgargied93@gmail.com> |
| **Sent:** | Thursday, December 3, 2020 9:09 PM |
| **To:** | mark@blairkim.com |
| **Cc:** | hutcml76@gmail.com; mzigler@mac.com; leah.altaras@gmail.com; cegonzalez@hotwire.com; clhefton@gmail.com |
| **Subject:** | Final warning old motherfucker |

Old motherfucker,

One more insult against Leah Altaras and I will literally cut your fucking dick in half and feed it to you. I'm sure your wife will have an "objection" to that!

7-SER-1700. Local prosecutors, judges, and politicians were sometimes copied. *See, e.g.*, 7-SER-1702-03 (transmitting a photo of a severed penis and stating "I'm coming to cut your dick in half lol"); 2-SER-501-02. Another included biographical details for Blair's wife. 7-SER-1705. Yet

---

[1] Sarah is Hutchins' sister. 2-SER-288.

another threatened her. 7-SER-1709. Blair estimated that he received over 125 harassing emails, and testified that he was "deeply concerned," considered buying a gun, and that his wife was "very upset" and unable to sleep well during this time. 2-SER-503-07.

Seattle Police Department (SPD) Detective Kailey Kang was assigned to the investigation into Garg's threats in October 2020. 3-SER-525. Garg promptly began harassing her, too, which had never happened to Kang in her many years of investigating similar cases. 3-SER-524, 535. Garg sent Kang emails calling her a "Chinese cunt" and "Chinese bitch" (7-SER-1710-11), as well as this email impersonating Hefton and attaching photos of Kang and her husband:

| From: | Lindsay Hefton <ciheftom@gmail.com> |
|---|---|
| Sent: | Thursday, December 10, 2020 10:54 PM |
| To: | kailey.kang@seattle.gov |
| Cc: | hutcml76@gmail.com; leah.altaras@gmail.com; mzigler@mac.com; cegonzalez@hotwire.com; sumitgargied92@gmail.com |
| Subject: | I will fuck you harder than Hudson |

Hello Kailey,

Did Ms. Hutchins talk to you about how my husband used to drill her pussy?

If Hudson isn't living upto the expectations - you have options! I could lend him for a night or two. It seems like you could use a good fuck.



7-SER-1712.

Following his now-typical pattern, Garg began referencing Kang's extended family in his emails. 7-ER-1714-16; 3-SER-540. This made

15

Kang fear for their safety. 3-SER-540-43. Kang received hundreds of messages, many of them with disturbing sexual content, *see, e.g.*, 7-SER-1718 ("KAILEY THE BEST PART ABOUT YOUR BOOBS IS THE MILKINESS ITS THE MILKIEST BREASTS I HAVE EVER SEEN"), and by mid-February 2021 the investigation was reassigned for her safety. 3-SER-535, 546. The Kangs moved because they "didn't feel safe in" their home, and Kang was "afraid to open [her] email for months." 3-SER-547.

Gary Ernsdorff, a county prosecutor, suffered similar harassment. 4-SER-793-94. Ernsdorff joined the investigation in the fall of 2020. 4-SER-795. In January and February 2021, two of Ernsdorff's colleagues working on the case began receiving harassing emails, including an email copying scores of local prosecutors, judges, lawyers, politicians, and journalists and listing the names of judges, prosecutors, and lawyers who had been assassinated. 7-SER-1719-23. The email ended with this phrase:

31.

32.

## LEAVING 31 AND 32 BLANK FOR NOW - LET

## US CALL THEM TO BE DETERMINED

7-SER-1722-23. Ernsdorff interpreted this February 15, 2021, email as a death threat and he decided to take "sole responsibility for the case going forward." 4-SER-803-04.

Ernsdorff also used this as a chance to "set[] a trap for Garg." 4-SER-805. Until that point, Ernsdorff had not been targeted, so when he took over the case, he told only Garg's attorney and did not enter an appearance in state court. 4-SER-804-05. Sure enough, Ernsdorff received his first harassing message that week, on Friday, February 19. 4-SER-806. By the next morning, Ernsdorff realized he had "unleashed a floodgate"—that weekend alone he received around 330 harassing emails. *Id.* This is just one example:

From: **Sumit Garg** <sumitgargied98@gmail.com>
Date: Sat, Feb 20, 2021 at 7:37 PM
Subject: Fwd: CUNT THERE IS NO ONE WHO CAN SAVE YOU FROM ME NOW
To: <gary.ernsdorff@kingcounty.gov>

I AM COMING FOR YOU

--------- Forwarded message ---------
From: **Sumit Garg** <sumitgargied98@gmail.com>
Date: Sat, Feb 20, 2021 at 7:31 PM
Subject: Re: CUNT THERE IS NO ONE WHO CAN SAVE YOU FROM ME NOW
To: hutcml76 <hutcml76@gmail.com>
Cc: <MEHUTCHINS@expediagroup.com>, <mzigler@mac.com>,
<czhutch@roadrunner.com>, <cegonzalez@hotwire.com>, <sarahhutchins@carbonwy.com>,
<info@genheration.com>

I WILL MAKE GONZALEZ WATCH WHILE I MAKE YOU MOAN UNDER ME

BELIEVE ME YOU WILL BEG ME FOR MERCY

 Sender notified by

Mailtrack

On Sat, Feb 20, 2021 at 7:29 PM Sumit Garg <sumitgargied98@gmail.com> wrote:

    IT IS LITERALLY A MATTER OF TIME BEFORE I FUCK YOUR BRAINS OUT

7-SER-1727.

Ernsdorff had received threats in other cases, but "[n]othing like this." 4-SER-812. In addition to the hundreds of emails threatening to assault and kill him and his family, Ernsdorff received emails about a Pornhub account established in his name and an appointment with a real estate agent to list his house (which included his address). 4-SER-816-

18

17. Ernsdorff described all this as "frightening," "dizzying," and "overwhelming," likening it to "a fire hose of hate pointed at me and my family." 4-SER-816. He couldn't sleep normally, and worried about his and his loved ones' safety. *Id.*

In all, between January 25, 2020, and March 8, 2021, Garg sent at least 3,700 harassing emails.[2] 5-SER-1078. According to Hefton, by early 2021, sending emails "was really all [Garg] did." 4-SER-904. In fact, Garg was so "consumed with" his harassment campaign that he made Hefton do his day job so that he could continue to work on harassing emails. *Id.*; *see also id.* ("He would hand me his laptop and say, 'Do this thing I have to do for work while I send e-mails.'").

### D. Garg graduates to physical stalking, stages a break-in at his home, and is arrested twice

Garg's harassment grew to include physical stalking. At 7:05 p.m. on October 10, 2020, Garg sent Hutchins this text:

---

[2] This does not include harassing text messages.



7-SER-1559. Six minutes later, Hutchins received an email titled "Hey Babe," attaching one photo taken outside her apartment building and two taken inside the lobby. 7-SER-1561-64. Hefton testified that Garg took and sent these photos. 4-SER-880-82.





7-SER-1562-64. Surveillance footage from the lobby shows Garg entering at 7:08 p.m., walking around, and appearing to take photos with his cellphone. *See* Gov. Trial Exhibits 121-22, 125.[3] Garg stipulated at trial that he was the person shown in these videos. 1-SER-146-47.



7-SER-1560.

---

[3] The government has moved for leave to file these video exhibits, as well as other physical trial exhibits, with the Court.

After receiving the "Hey Babe" email, Hutchins immediately called the police. 1-SER-143. This episode gave her nightmares, made her and Gonzalez scared to go outside, and caused them to install security cameras inside their apartment. 1-SER-161; 2-SER-383-84.

Three weeks after photographing her lobby, Garg sent Hutchins this message:

| | |
|---|---|
| **From:** | Sumit Garg <sumitgargied92@gmail.com> |
| **Sent:** | Saturday, October 31, 2020 8:50 PM |
| **To:** | hutcml76@gmail.com |
| **Cc:** | sumitgarg90@gmail.com; clhefton@gmail.com |
| **Subject:** | I will first rape you and then kill you |

I will first rape you and then kill you

Then this one (attaching a photo of the Tower 12 building rooftop):

| | |
|---|---|
| From: | Sumit Garg <sumitgargied92@gmail.com> |
| To: | hutcml76@gmail.com |
| Cc: | sumitgarg90@gmail.com, seattle.kcdc@kingcounty.gov, mzigler@mac.com, mark@blairkim.com |
| Date: | Sat, 31 Oct 2020 22:10:21 -0700 |
| Attachments: | 160238217730914618806118201579994.jpg (2.41 MB) |

The rooftop is amazing. This is where I will fuck you when we meet

And this one (showing the Tower 12 gym):

23

## Re: Hey babe

| | |
|---|---|
| From: | Sumit Garg <sumitgargied92@gmail.com> |
| To: | hutcml76@gmail.com |
| Cc: | cegonzalez@hotwire.com, mark@blairkim.com, mzigler@mac.com |
| Date: | Sat, 31 Oct 2020 22:18:41 -0700 |



This is where that pussy gets in shape

On Sat, Oct 31, 2020 at 10:06 PM Sumit Garg <sumitgargied92@gmail.com> wrote:
I'm downstairs sweetheart #1305

I see Gonzalez has fled

7-SER-1582, 1578, 1615; 1-SER-156-61. The reference to Hutchins'
apartment number (#1305) made Hutchins feel "overwhelming fear that
this person definitely knew exactly where I was." 1-SER-160.

Meanwhile, the same evening Garg sent those messages, he made
Hefton call 911 from their house. But first Garg told Hefton "I need you

24

to film me in the backyard." 4-SER-883. He "wanted to film someone breaking into the backyard and going into the shed" and he "was going to put gloves on, so that he didn't touch anything and leave fingerprints, put a coat on and a mask and jump the fence, go into our shed, and jump back out." 4-SER-884. When Hefton hesitated, Garg said, "I'm going to bang your head against this wall. Get up." *Id.*

Garg wanted their security camera to capture the video, so he practiced climbing over the fence to make sure it triggered the system. 4-SER-884-85. The alert didn't trigger the first time so, after adjusting the camera, Garg had to climb into the yard again. 4-SER-885. After helping film the clips, Hefton called 911 to report that someone had broken into the backyard. 4-SER-889-91.

Officer Timothy Oliverson responded to the 911 call. 2-SER-443; 4-SER-891. His body-worn camera captured his interactions with Garg and Hefton. *See* Gov. Trial Exhibit 231; 2-SER-444-45. Oliverson waited two-and-a-half minutes after ringing the doorbell before Hefton answered. 2-SER-447. After speaking briefly with her, Oliverson went around to the backyard, and Garg came out of the house, just a little over four minutes after Oliverson rang the doorbell. 2-SER-447-49. Garg and Hefton said

they believed Gonzalez had broken into their yard, and they gave Oliverson three security videos supposedly showing the intruder (but really showing Garg's staged break-in). 2-SER-457; Gov. Trial Exhibits 233-35.

While Oliverson spoke with Garg and Hefton, they "appeared to be getting notifications, audible notifications on their cell phones, which they then showed to" Oliverson. 2-SER-451-52. Garg seemed to want "to make a point"; he said: "See, … [w]e're standing here together. I'm talking to you. I couldn't be sending these e-mails. They're arriving at this moment. So how could I be sending them?" 2-SER-452. Oliverson photographed the emails on Garg's phone. *Id.*; *see also* 7-SER-1583-88, 1592, 1596, 1600, 1604, 1608. Forensic review of data from Google showed that Garg wrote these emails before Hefton answered the door and while she was speaking with Oliverson and scheduled them to arrive while both Garg and Hefton were speaking with the officer. 5-SER-1217-36; 6-SER-1535 (timeline). Garg also later told Hefton that he had written and scheduled the emails, and that he had deliberately included content that would make her cry (presumably the claims that Garg had

impregnated Hutchins and that his "bitch wife will die," 7-SER-1600) so that "it would be more realistic to the officer." 4-SER-892.

By the next day, November 1, 2020, Detective Kang had decided—considering Garg's visit to Tower 12 and his escalating threats to rape and kill—that he presented a danger of "targeted violence," and it was "important to intercede and arrest" him. 3-SER-594-95; *see also* 4-SER-797 (Ernsdorff testifying that "the breach into" Tower 12 "caused a significant increase in our threat assessment and our concern" and caused investigators to "act more quickly"). Knowing that Garg had evaded service of process multiple times, Kang believed that because of their prior interactions, Garg and Hefton were more likely to respond to Officer Oliverson. 3-SER-595-96; *see also* 2-ER-213. Accordingly, Oliverson and Officer Sean Daily, after calling to let Garg and Hefton know they had some follow-up questions about the burglary, arrived at their doorstep that evening. *See* 2-ER-168. Garg and Hefton invited them in, whereupon Daily took Garg's phone and arrested him. 2-SER-462-63.

Garg was in state custody between November 1 and November 13, 2020, and then released on electronic home monitoring. 1-SER-161-62; 4-SER-800-01, 827-28. While Garg was in custody, state prosecutors

obtained a domestic-violence protection order for Hutchins' benefit and a general no-contact order for Gonzalez, Zigler, and others. 4-SER-798-800; 8-ER-2015-19.

There was an immediate and "significant" decrease in the volume of harassing emails while Garg was in custody. 4-SER-98; *see also* 1-SER-161. The emails didn't stop altogether, though, because Hefton continued sending some. 4-SER-892-93. She did so because she knew Garg "would want [her] to, because as soon as he got arrested, if the e-mails stopped, that would mean he was the one sending them." 4-SER-893. On a jail call, Garg told Hefton he was "proud" of her "for doing that," and that she "did the right thing." *Id.*

Recordings of Garg's jail calls confirm that he instructed Hefton to continue sending emails, and to hide evidence of his stalking visit to Tower 12. *See* 4-SER-894-900; 7-ER-1781-87; Gov. Trial Exhibits 527, 529. Hefton sent emails because she feared what Garg would otherwise do to her when released, especially "since he seemed aggravated and stressed by being in jail." 4-SER-899-900. But Hefton tried to avoid sending emails "that would create a sense of immediate threat for anyone else." 4-ER-900.

By contrast, almost as soon as Garg was released late in the evening on November 13, 2020, he resumed sending overtly threatening emails, like this one:

| | |
|---|---|
| **From:** | Sumit Garg <sumitqarg9o@gmail.com> |
| **Sent:** | Sunday, November 15, 2020 1:54 PM |
| **To:** | hutcml76@gmail.com |
| **Cc:** | mzigler@mac.com; pdayton@omwlaw.com; mark@blairkim.com; kailey.kang@seattle.gov |
| **Subject:** | Don't be scared |

"Spicy",

Did you really think a few days in jail was going to scare me?

Don't be scared. I won't kill you.

It is too easy and not nearly enough punishment for your crimes.

I have other ideas to take care of you.

Mr. Zigler, as for you, you won't see 2021. I recommend enjoying every day you can from what I'm hearing you are with Ms. Hutchins.

Garg

7-SER-1619. He also started texting again:

29



7-SER-1665. According to Hutchins, it "just kept coming in, like the floodgates had opened" (1-SER-162), and it was clear that Garg "was not swayed at all by any possible consequences or law enforcement or really anything." 1-SER-164. Hutchins and Gonzalez left town on November 21 for a month-long stay with Hutchins' parents in New York, the only place Hutchins "felt safe at the time." 1-SER-165.

Garg continued his harassment, trying to frame Hutchins and Gonzalez while concealing what he was doing. For instance, Garg had Hefton place an envelope of photos of Garg with other women in their own mailbox and then call the police to claim it may have been left by

Hutchins and Gonzalez.[4] 4-SER-909-11. He had Hefton change metadata on some digital photos to make it appear they were taken on the model of cellphone Gonzalez used. 4-SER-912-13. And Garg insisted on hiding the clothes from his stalking visit to Tower 12 because he "didn't want any evidence visible, if [the] house was ever searched, that he owned the clothes he had worn on October 10." 4-SER-902.

Hefton later told authorities that those items were hidden behind the shed in the backyard, and law enforcement recovered Garg's clothes, two old cellphones that Hefton had wiped, and books and other technical computing guides that belonged to the couple. 4-SER-903, 922. Garg hid the books because he "didn't want any evidence that [they] knew anything technical because it would raise suspicion that [they] had the skill required to send the emails that had been sent." 4-SER-903-04.

_____

[4] Hefton was not aware that they were then in New York. 4-SER-911.

 

8-SER-1989-90.

By late 2020 and into early 2021, Garg had established so many stalker email accounts that he was "running into issues … that he couldn't set up any new e-mail accounts without getting an authentication code." 4-SER-905. He had "burner phone apps" but those couldn't be used for authentication, so "he got around that by sending [the codes] to his family in India and then calling them and saying, 'Give me the code.'" *Id.*

At this point, Garg was mostly using Hefton's work laptop to send his stalking emails. 4-SER-906. He made Hefton download Proton VPN—software that allows a user to mask their true IP address (4-SER-877-79, 906-08; 5-SER-1025-26)—and show him how to use it. 4-SER-906-07. Yet Garg was not always successful at remaining anonymous online by using

a VPN service. Analysis of the IP addresses assigned to devices used to access Garg's stalker accounts and Garg and Hefton's true accounts showed multiple instances of overlap between February 2020 and January 2021; that is, instances where the stalker accounts and Garg and Hefton's true email accounts were being accessed from the same IP address. 5-ER-1034-49; Gov. Trial Exhibit 11; 5-SER-1046-47 (log-out from Garg's true email account and, five minutes later, the creation of a new stalker account from the same IP address). Some of the IP addresses belonged to a CenturyLink account registered to Garg and Hefton. 5-SER-1037-42.

Records from Garg and Hefton's true email accounts also showed that both had been accessed on one of the wiped cellphones recovered from behind the shed. 5-SER-1050-54. Records from at least four stalker email accounts showed that those accounts, too, were accessed from that device. *Id.*; *see also* 6-SER-1518-19.

Meanwhile, by February 2021, the state investigation into Garg had "been proceeding along, getting very good evidence linking [him] to the stalker." 4-SER-817. Garg's flurry of emails on February 20 and 21, 2021, reached a crescendo (5-SER-1080), the state obtained an arrest

warrant, and on February 26, Garg was again taken into custody. 4-SER-817-18, 917. He was federally charged on March 5, 2021 (CR-1), and transferred to federal custody on March 8 (4-SER-819), where he remained until his trial in 2024 on charges of conspiracy to engage in cyberstalking, three counts of cyberstalking, and three counts of cyberstalking in violation of a criminal order. 1-ER-2-13.

Hefton sent some harassing emails between February 26 and March 8 because Garg told her that's what she should do "if he was ever arrested again." 4-SER-917. She stopped sending them once Garg was transferred to federal custody in part because she "knew that [she] was not going to have to deal with abuse anymore because it was going to be a very long time before he came home, if he ever did." 4-SER-920-21. Not a single harassing email was received by any of Garg's victims after March 8, 2021. 5-SER-1080-81.

### E. *Garg fires three attorneys and one standby counsel, obsessively litigates his federal case, represents himself during a ten-day trial, and is convicted*

Garg was represented by an appointed attorney until September 2021, when he withdrew at Garg's request after Garg moved to represent

himself.[5] *See* CR-7, 10; 11-ExParteER-2152-59; CR-70. During a hearing on September 2, the magistrate judge told Garg that representing himself was his "absolute[] right" but that it was "a very, very serious matter that you have to take extremely seriously." 11-ExParteER-2173. Garg said he was willing to "hav[e] a try with another lawyer," so long as that lawyer would not need a continuance. *Id.* On September 7, 2021, the district court appointed Peter Camiel. CR-72. Three days later, after briefly changing his mind and asking his original attorney to stay on (*see* 11-ExParteER-2212-13), Garg wrote to the court, "I just want to express my gratitude to all involved … for appointing me my dream counsel, Peter [C]amiel. I am just so happy." 1-SER-19.

A year later, about two weeks before the pretrial-motions deadline, Garg wrote to the court recounting limitations in his ability to review discovery while in pretrial detention. 5-ER-913-16 (signed on August 30, 2022, and filed on September 6). Garg had not been shy about expressing dissatisfaction with his counsel, but nowhere in this letter did he complain about Camiel's representation or express any concerns with

---

[5] Garg had moved for his attorney to withdraw in late June 2021 but changed his mind. 1-SER-18.

Camiel's proposed strategy for pretrial motions. *See id.* On September 7, citing its local criminal rules, the court struck Garg's letter and explained that Garg could not file a pro se motion unless he moved to represent himself. 5-ER-918-19.

Camiel filed a suppression motion on September 19, 2022 (the pretrial motions deadline), noted for September 30. 2-ER-126. On October 3, Garg sent a pro se filing (filed on October 5), styled as a "motion to conduct inquiry into attorney client conflict." 5-ER-921-42. In it, Garg again recited his complaints about access to discovery. *See* 5-ER-922-29. He took issue with specific items Camiel had not moved to compel or otherwise failed to obtain (*see* 5-ER-930-35) but still did not ask to proceed pro se or seek Camiel's withdrawal. *See* 5-ER-941. On October 6, the court struck Garg's filing, noting his repeated improper attempts to file pro se motions, and again instructed that Garg could move to represent himself. 5-ER-949.

On October 7, the court denied Camiel's motion to suppress. 1-ER-14. Two days later, Camiel—at Garg's direction—moved to withdraw. 5-ER-951; 11-ExParteER-2179-81. The same day, Garg mailed a pro se motion to appoint new counsel (11-ExParteER-2182-95), and a

36

supplemental motion (11-ExParteER-2196-2203). That supplemental motion, filed only after the denial of Camiel's suppression motion, raised, for the first time, dissatisfaction with Camiel's motion. 11-ExParteER-2196-2201.

At the October 13, 2022, hearing on Camiel's motion to withdraw, Garg stated that his "central issue" was his "access to discovery." 11-ExParteER-2216. Garg indicated that he would "accept [Camiel's] strategic decisions" but felt "challenged by the inability to" review discovery materials. 11-ExParteER-2219. After further colloquy, Garg said he wanted new counsel. 11-ExParteER-2230. The court again reminded Garg that he could not file pro se motions while represented and that any pro se filings would be stricken. 11-ExParteER-2231. Garg said: "[I]t won't happen again." *Id.*

Four days later, Garg mailed a motion to proceed pro se. 11-ExParteER-2236-44 (filed on October 20). Simultaneously, the court appointed Stephan Illa to represent Garg. CR-166. The court held a hearing on November 7, 2022, to untangle the situation. CR-173. It conducted a full *Faretta* inquiry, granted Garg's motion to proceed pro se,

and appointed Illa as standby counsel.[6] 1-SER-20. But the court cautioned Garg that "the pretrial motions deadline in the case had already passed, and that there was no guarantee the deadline would be extended just because Mr. Garg was now *pro se*." *Id.*

When Garg took over his representation, there were 174 entries on the district court docket. 9-ER-1929. But the ferocity of Garg's litigating strategy echoed his stalking campaigns, and when trial began 16 months later, the docket had swelled to 860 entries (an average of 42 new entries per month). 9-ER-1972. During that time, Garg also filed three interlocutory appeals, all of which were dismissed. The volume of Garg's filings became so unmanageable that by March 2023, the district court limited Garg to one motion per week not to exceed 15 pages (more honored by Garg in the breach, *see generally* 9-ER-1940-70).[7] 1-ER-46.

---

[6] Garg later fired Illa. CR-507, 523. Nicholas Vitek was appointed in October 2023 and remained as standby counsel through trial. CR-755.

[7] Even apart from Garg's breaches of the order, he was allowed to file nearly 50 motions between March 2023 and trial a year later. *See* 9-ER-1940-70. His filings and attempted filings ranged from picayune (access to highlighters, *see* CR-566; changing his visitation time to accommodate his bowel movements, *see* CR-549, 625; being too cold in a room where the thermostat was set to 72-degrees, *see* CR-392, 438) to grandiose (motion to dismiss for "flagrant government misconduct," *see*

(continued . . .)

Garg's ten-day jury trial began on March 11, 2024. CR-861. Six of Garg's victims testified for the government, and so did Hutchins' ex-boyfriend, Bieber. Hefton also testified, as did six law-enforcement witnesses, an Amazon security engineer, and the interpreter who translated some of Garg's jail calls from Hindi into English. *See generally* 1-SER-88-5-SER-1288. Garg called six witnesses and chose not to testify. *See* 5-SER-1289-6-SER-1400. Garg's defense was that he was framed by his victims, that the government rushed to judgment, that he was protecting his wife (*see* 1-SER-73-87), but also that his wife was to blame (6-SER-1457-93). *See, e.g.*, 6-SER-1462 ("Lindsay [Hefton] can be a little volatile. … Lindsay started retaliating.").

The jury deliberated for less than three hours before convicting Garg on all counts. 6-SER-1499. The court sentenced Garg to 108 months in prison, followed by three years of supervised release. 1-ER-111-12.

## SUMMARY OF ARGUMENT

1.    The district court repeatedly warned Garg that it would not reset the pretrial motions deadline just because he chose to proceed

---

CR-425). The court lifted its docket-control order in February 2024 so that Garg could file all necessary trial submissions. CR-832.

pro se. Nevertheless, Garg filed an untimely motion to suppress evidence from the cellphone seized during his November 1 arrest. Rather than reaching the merits of that motion, this Court can simply conclude the district court did not abuse its discretion in finding no good cause to consider this untimely filing and that Garg has not shown good cause for appellate review, either.

But Garg's motion fails on the merits in any event. His reliance on "ruse" cases to argue that his November 1 arrest was unreasonable under the Fourth Amendment is misplaced. For months, Garg tried to manipulate law enforcement to frame his victims, and he originated the ruse the police ultimately relied on to speak with him on November 1. These facts do not implicate the values this Court's ruse cases are meant to protect. And Garg's convictions survive even without the evidence he challenges. The government presented overwhelming other evidence of his guilt, so any error in presenting evidence from Garg's cellphone at trial was harmless beyond a reasonable doubt.

2.     Garg claims his Sixth Amendment right to self-representation was violated because the district court would not let him file any motion his prior counsel could have filed and because he was prevented from

conferring with his computer expert. Both assertions are wrong as a factual matter and rest on a selective presentation of the record. The full record shows that Garg was able to meaningfully represent himself while in pretrial detention, and Garg does not explain how the district court's rulings prevented him from advancing any of his defense theories.

3.    Garg's attorney repeatedly advised him, in person and in writing, that he faced significant sentencing exposure, and told Garg that his Guidelines range could be as high as 210-262 months. Garg refused to believe these calculations or heed his attorney's advice to take the government's 48-month plea offer. Garg only changed his mind after the government finished its forensic review of his devices, when Garg finally accepted that the government had overwhelming and incontrovertible evidence of his guilt. Garg later moved to reinstate the 48-month plea offer, arguing his attorney was constitutionally ineffective during plea negotiations. The district court did not clearly err in finding that Garg's attorney correctly advised him about his potential sentencing exposure, and it did not err in concluding there was no reasonable probability that any additional advice would have led Garg to accept the 48-month offer.

4.    The jury was correctly instructed on the cyberstalking counts under binding precedent—precedent that Garg neither cites nor acknowledges in his opening brief. Both before and after the Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. 66 (2023), this Court has rejected the notion that cyberstalking under 18 U.S.C. §2261A(2) requires a jury to find a defendant communicated true threats. As this Court has repeatedly explained, the statute proscribes harassing and intimidating conduct. Such conduct was proven beyond a reasonable doubt here. Garg's argument about the jury instruction for stalking in violation of a criminal order is unpreserved but, regardless, any error in that instruction was harmless. The evidence that Garg engaged in harassing conduct both before and after the entry of criminal protection orders was overwhelming.

5.    Garg's argument that Count 8 should have been dismissed depends on the same true-threats argument he raises about the jury instructions. It fails for the same reasons.

## ARGUMENT

### I. Evidence from Garg's phone was not suppressible; regardless, its admission was harmless considering the overwhelming evidence of Garg's guilt

#### A. *Standard of review*

This Court reviews the denial of a motion to suppress de novo and the district court's factual findings for clear error. *United States v. Job*, 871 F.3d 852, 859 (9th Cir. 2017). Failure to suppress evidence from a Fourth Amendment violation is harmless if "'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 865 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

"The decision whether to grant an exception to a Rule 12 waiver lies in the discretion of the district court." *United States v. Tekle*, 329 F.3d 1108, 1113 (9th Cir. 2003). Issues deemed waived under Rule 12 may be reviewed by this Court "where good cause is shown for the party's failure to raise the argument earlier." *United States v. Anderson*, 472 F.3d 662, 669 (9th Cir. 2006).

#### B. *Procedural background*

Camiel's suppression motion described the "ruse" SPD officers used to speak with Garg before arresting him on November 1, 2020. 2-ER-127-

28. Arguing that Garg did not consent to his phone's seizure, Camiel asserted that it is "unlawful for a government agent to obtain entry 'by misrepresenting the scope, nature or purpose of a government investigation.'" 2-ER-137 (quoting *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990)). Citing more ruse cases, Camiel explained that when the government agent "is known to the suspect as such, and invokes the trust or cooperation of an individual to search or seize items outside what is lawfully authorized, such a ruse is unreasonable under the Fourth Amendment." 2-ER-138. On that basis, Camiel argued that the seizure of Garg's phone was "unlawful" and that "any information obtained from that device should be suppressed." *Id.*

The government's response noted Garg's argument "that any alleged consent would have been invalid, because of the officers' supposed misrepresentations about the true purpose of their visit." 3-ER-529. The government then distinguished the ruse cases Camiel cited, explaining that "Garg—not officers—initiated the deception by falsely reporting to officers and fabricating evidence, including on October 31, 2020, to claim that his victims were committing crimes and stalking" him. *Id.* Thus, the

only thing the arresting officers did on November 1 was "play along with Garg's fraud by contacting him to follow up on [his] lies." *Id.*

In its order denying suppression, the district court found that officers had called Garg "to indicate they would be returning to follow up on his October 31 report," that Garg and Hefton "invited the officers to come inside," and at "that point, [Garg] did not know the officers were there to arrest him." 1-ER-15. The court also noted that "[n]either party disputes the fact that [Garg]'s arrest was a lawful probable cause arrest" (1-ER-16), and concluded that although Officer Daily took Garg's phone before Garg was arrested, it was still lawfully seized incident to arrest and would inevitably have been discovered by lawful means. 1-ER-17-18.

As detailed above, Garg did not seek Camiel's withdrawal until almost three weeks after the suppression motion was filed, and two days after it was denied. Garg did not finally and unequivocally ask to proceed pro se until almost two weeks after that, and at his *Faretta* hearing on November 7, 2022, the court warned Garg there was no guarantee that his pretrial motions deadline would be extended. 1-SER-20.

A week later, Garg moved "for leave to file pretrial motions for good cause." 5-ER-994. Garg falsely stated that he had "request[ed] relief with

45

respect to issues with Counsel Camiel" on September 2, ignoring that nowhere in that letter (written on August 30 and filed on September 6) did he complain about Camiel's representation. *See* 5-ER-913-16. By his own admission, Garg did not try to alert the court to his "frustration with Mr. Camiel's failure to litigate certain fourth amendment claims" until after the court had denied the suppression motion. 5-ER-999.

The government opposed Garg's request to reset the Rule 12 deadline, except for motions based on newly disclosed discovery. *See* 5-ER-1020-31. It argued that Garg "chose to be represented by counsel through the pretrial motions phase," and his choice was knowing and deliberate considering that he had earlier filed and then withdrawn motions to represent himself. 5-ER-1026. The government also argued that insofar as Garg was asserting that Camiel's alleged ineffectiveness constituted good cause for resetting the pretrial-motions deadline, Garg failed to show that Camiel's performance was constitutionally inadequate or that the outcome of his case would be different "were he granted a new pretrial motion deadline." 5-ER-1028.

The district court declined to reset the deadline, finding that Garg "made the choice to proceed with counsel until after the pretrial motions

deadline," declined the option "to proceed *pro se* earlier," and was "not entitled to relitigate issues that have already been decided by the [c]ourt just because" he was now pro se. 1-ER-24-26. Acknowledging that Garg might have good cause to file new motions based on "evidence that was not available to him before the pretrial motions deadline had already passed," the court established a procedure for seeking leave to do so. 1-ER-25-26.

Five months later, Garg filed a 97-page suppression motion, along with a 30-page motion purporting to show good cause. *See* 3-ER-557-4-ER-728. Garg claimed that the court had failed "to liberally construe [his September and October 2022] pro se letter and motion alleging deficiencies with Mr. Camiel prior to the motion to suppress being denied." 4-ER-700.

Because the court had denied Garg's first motion to reset the Rule 12 deadline, the government urged the court to treat Garg's arguments as requests for reconsideration. 4-ER-731. The government argued that Garg had shown neither manifest error in the court's refusal to reopen the deadline nor new facts or legal authority that could not have been brought to the court's attention earlier. 4-ER-738.

Addressing Camiel's alleged ineffectiveness, the government explained that Camiel "did challenge the validity [of] Garg's arrest, and argued that the officers' entry into Garg's house could not be justified as consensual because it was based on a misrepresentation."[8] 4-ER-745. Again, the government explained that the officers "were merely playing along with Garg's fraud, not making any new misrepresentations." 4-ER-745-46.

The court denied Garg's motions to show good cause and to suppress. 1-ER-68-69.

### C. The district court did not reversibly err in admitting evidence from Garg's phone

#### 1. The district court did not abuse its discretion in refusing to reopen the pretrial motions deadline

Suppression claims must be raised in a timely pretrial motion. Fed. R. Crim. P. 12(b)(3)(C). Failure to comply results in a waiver of the

---

[8] This statement was imprecise. Camiel relied on the ruse cases to argue that the seizure of Garg's *phone* was not consensual. 2-ER-137; *see also* 3-ER-528-29. But in denying suppression, the court acknowledged the ruse and Camiel's argument that "this was not a consensual search." 1-ER-17-18. Accordingly, the government was correct in suggesting that the court's order "denying Mr. Camiel's motion confirms that any challenge based on *Payton* would lack merit," so Garg could not show prejudice. 4-ER-746.

issue (not mere forfeiture), *see United States v. Ghanem*, 993 F.3d 1113, 1120 (9th Cir. 2021), though this waiver can be excused on a showing of good cause. Fed. R. Crim. P. 12(c)(3); *United States v. Guerrero*, 921 F.3d 895, 898 (9th Cir. 2019). Here, the district court did not abuse its discretion in twice declining Garg's requests to reset the Rule 12 deadline. *Tekle*, 329 F.3d at 1113; *see also* Fed. R. Crim. P. 12(c)(2).

Garg has not claimed that the district court clearly erred in finding that he chose to be represented up until the court denied Camiel's suppression motion. *See United States v. Hinkson*, 585 F.3d 1247, 1262-63 (9th Cir. 2009) (en banc) (this Court affirms a district court's factual findings "unless … illogical, implausible, or without support in inferences that may be drawn from the record"). Nor could he. Despite his efforts to recharacterize them, Garg's September 6 and October 5, 2022, pro se filings did not seek Camiel's withdrawal and did not raise purported concerns with Camiel's suppression strategy. *See* 5-ER-913-16, 921-42.

Nor does Garg dispute the district court's conclusion that he was "not entitled to relitigate issues that [had] already been decided by the Court just because he" chose to proceed pro se after the deadline. 1-ER-25. It is within a court's discretion to conclude that a "belated decision to

change trial tactics" is not good cause under Rule 12. *United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir. 1984); *cf. United States v. Flewitt*, 874 F.2d 669, 675 (9th Cir. 1989) (pro se status "does not excuse a criminal defendant from complying with the procedural or substantive rules of the court" and does not entitle him to "greater rights than a litigant represented by counsel"). Garg also does not renew any claim on appeal that there was good cause for the district court to allow him to file a new suppression motion because Camiel was ineffective in failing to challenge the lawfulness of his arrest. *See* AOB-20-32. And Garg makes no meaningful attempt to show resulting prejudice. *Id.*

As a result (assuming this Court concludes the district court did not reach the question of the lawfulness of Garg's arrest), the Court should simply affirm the district court's decisions not to reset the Rule 12 deadline. Neither decision was an abuse of discretion and Garg does not argue otherwise.[9]

Instead, Garg cursorily asserts that this Court should find good cause to consider the issue under Rule 12(c)(3). *See* AOB-29. He states

---

[9] Garg cannot claim in reply that the district court abused its discretion, as the issue is now "'deemed waived.'" *United States v. Anekwu*, 695 F.3d 967, 985 (9th Cir. 2012) (citation omitted).

that good cause is a "flexible standard" requiring "consideration of all interests in the particular case," but does not explain why his counsel's alleged refusal to challenge the lawfulness of his arrest and Garg's subsequent "prompt, unrelenting months-long endeavor to have the court address the challenge" weigh in favor of now reviewing his claim. *Id.* Garg was "unrelenting" in his pro se litigation strategy about virtually every issue, over many months. But that does not mean his untimely claims were meritorious or that there is good cause to review them now.

Even if the district court abused its discretion in not resetting the Rule 12 deadline, Garg's argument about suppression has no merit for two reasons. First, his warrantless arrest on November 1 was reasonable under the Fourth Amendment. And second, the evidence from his phone at trial was harmless beyond a reasonable doubt considering the overwhelming evidence of his guilt.

> ### 2. Garg's probable-cause arrest was reasonable considering his months-long manipulation of law enforcement and his responsibility for the ruse

Law enforcement "'may use deceit in certain circumstances.'" *United States v. Ramirez*, 976 F.3d 946, 952 (9th Cir. 2020) (quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932)). The "'particular

circumstances of each case govern the admissibility of evidence obtained by stratagem or deception.'" *Id.* (quoting *Lewis v. United States*, 385 U.S. 206, 208 (1966)). "The benchmark for the Fourth Amendment is reasonableness, which requires [the Court] to weigh the government's justification for its actions against the intrusion into the defendant's interests." *United States v. Alverez-Tejeda*, 491 F.3d 1013, 1016 (9th Cir. 2007). That balance tips against Garg here.

Generally, deception is "unlawful when the government makes its identity as law enforcement known to the target of the ruse and exploits the target's trust and cooperation to conduct searches or seizures beyond that which is authorized by … probable cause." *Ramirez*, 976 F.3d at 953. The rule seeks to protect a "'private individual's trust in his government'" because "'people should be able to rely on [the] representations of government officials.'" *Id.* at 954 (quoting *Alverez-Tejeda*, 491 F.3d at 1017 (cleaned up)). *See also Whalen v. McMullen*, 907 F.3d 1139, 1147 (9th Cir. 2018) (concern with "betray[al]" where officer appealed to a person's "trust in law enforcement and her sense of civic duty to assist him in his 'identity theft' investigation"). But no such interest is implicated here.

By the time officers arrested him on November 1, Garg had been manipulating law enforcement for months. He sent himself and Hefton stalking emails from accounts he created impersonating Hutchins and others and then reported Hutchins for harassment. 1-SER-128; 4-SER-877. Garg made Hefton file a false police report claiming that Hutchins had been following her, calling police to their apartment and giving Hefton "photos to attach to the police report," as well as telling her "what to say." 5-SER-871-72. He made Hefton file a civil suit against Hutchins (1-SER-128-29; 2-SER-283) and apply for a protection order against Gonzalez (2-SER-387-88), and Garg filed a false report that Gonzalez had put a gun to his back. 2-SER-455.

The night before his arrest, Garg staged and recorded a burglary at his own house and then scheduled stalking emails to arrive while he was talking to the responding officer. 2-SER-444-52; 4-SER-883-92; 5-SER-1217-36. Because he had evaded service in the past (3-SER-595-96; 2-ER-213), officers went along with Garg's burglary ruse to make sure he would be home and would answer the door after his escalating conduct made it clear he presented a threat of "targeted violence." 3-SER-594-95. Considering all these circumstances, the fact that the officers played

along with Garg's own ruse does not render his arrest unreasonable under the Fourth Amendment.

The officers' actions here do not implicate the values—like promoting trust in law enforcement and performance of civic duties—that this Court's ruse cases are intended to protect, *see Whalen*, 907 F.3d at 1147, because Garg was already manipulating law enforcement, not honestly reporting crime. Nor did officers fabricate a ruse out of whole cloth, as in the ruse cases. *See, e.g.*, *id.* (purported identity-theft investigation); *Ramirez*, 976 F.3d at 950-51 (FBI agents disguised themselves as police, claimed to be investigating a burglary, and used the defendant's friends and family to lure him back to the property where they had "staged a Fresno police car in front of the home to elaborate upon their ruse"); *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) (ATF agent posed as and accompanied another state official touring defendant's premises as part of a licensing inspection); *United States v. Phillips*, 497 F.2d 1131, 1133 (9th Cir. 1974) (uniformed officers asked "to enter to investigate a report of burglary in the building" when there was "no such report"). Rather than inventing a ruse, the officers simply

played along with Garg's painstaking attempt to fake a burglary and frame Gonzalez.

Concluding that Garg's Fourth Amendment rights were violated on these facts would reward his abuse of the law-enforcement systems designed to protect against the very harassment and stalking Garg was perpetrating. Garg cynically and repeatedly tried to harness law enforcement in furtherance of his scheme. His incidents of crying wolf were escalating, just like the severity and frequency of his threats and other conduct. Far from betraying Garg's trust by tricking their way onto his property, officers used the opportunity that Garg had initiated to bring his abuse to a halt. The Court should reject Garg's claim that his arrest was unreasonable.

### 3. Evidence from Garg's phone was harmless beyond a reasonable doubt

Even if the Court concludes that evidence from his phone should have been suppressed, Garg's convictions survive. The case against him was based on overwhelming evidence, most of which was not derived from his phone, and Garg is simply wrong that his phone was "the centerpiece of the government's case at trial." AOB-24.

Harmless-error review requires "an evaluation of the remaining incriminating evidence in the record" and "'perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact.'" *United States v. Harrison*, 34 F.3d 886, 892 (9th Cir. 1994) (citation omitted). This Court has reversed, for example, where the erroneously admitted evidence was a defendant's confession, which is "probably the most probative and damaging evidence that can be admitted against [him] and may tempt the jury to rely upon that evidence alone in reaching its decision." *Id.* at 893 (internal quotation marks and citation omitted). Similarly, it has reversed based on "the overall weakness of the government's case" without the tainted evidence. *United States v. Newman*, 943 F.2d 1155, 1158 (9th Cir. 1991). But where, as here, other overwhelming evidence proves the defendant's guilt, the Court has found such error harmless beyond a reasonable doubt. *See, e.g.*, *United States v. Gonzalez-Sandoval*, 894 F.2d 1043, 1049 (9th Cir. 1990); *Job*, 871 F.3d at 865-66.

The government proved Garg's guilt through extensive victim testimony. The jury saw hundreds of examples of harassing and threatening emails and texts that Garg sent to his victims, and it heard

about his other harassing conduct. The jury also heard about the trap Ernsdorff set for Garg by telling only Garg's lawyer that he was taking over the investigation, whereupon Ernsdorff was immediately harassed. And the jury saw that the stalking campaign ended the moment Garg was taken into federal custody in March 2021.

But the government also presented testimony from Garg's wife and co-conspirator, Hefton. She told the jury that Garg's obsession consumed him full time, that he did nothing but send harassing emails, and that he abused her to force her to help him execute his campaign. She testified that Garg told her he had read Hutchins' diary, and the jury saw the early emails to Hutchins that referenced the diary's contents. They also learned that Garg's fingerprints were found on the diary.

Hefton explained the technical steps she took to help Garg conceal his identity online. She described Garg's visit to Tower 12, and how he took the lobby photos and attached them to the email he immediately sent to Hutchins. Hefton's account of that night was corroborated not just by the surveillance footage of Garg using his phone in the lobby, but also by Garg's stipulation that he was the person in the surveillance video, and by the recovery of the clothes he wore that night from his backyard.

The jury also heard Garg's jail calls, in which he told Hefton to keep sending harassing messages while he was incarcerated and to hide the evidence of his stalking visit to Tower 12. The jury saw the security-camera footage Garg sent to Officer Oliverson showing the burglary Garg staged. It saw the pre-scheduled emails Garg ensured arrived while Oliverson was at Garg's house, and it reviewed the forensic evidence from Google showing that it was Garg—and not Hefton—who scheduled them. The government also presented other forensic evidence. The jury heard about the IP overlap and device overlap between Garg's true email accounts and stalker email accounts that investigators were able to identify and analyze from account information subpoenaed from internet-service and email providers.

All this evidence clearly incriminated Garg, and none of it came from his phone. In fact, this brief's statement of facts cites *only* the trial evidence derived independently from Garg's phone, and yet it shows beyond any reasonable doubt that Garg committed the offenses with which he was charged.

Admittedly, evidence from Garg's phone also reinforced his guilt, but Garg overstates the focus it received at trial.[10] Garg asserts that the "government opened on the Pixel 3a" (AOB-30), but then cites four short mentions of evidence derived from the phone in a transcript of opening argument that spans 14 pages and describes a mountain of other directly incriminating evidence.[11] 1-SER-59-73. Garg does the same when he asserts that the government "closed on the Pixel 3a" (AOB-30) but then cites just three instances in 40 transcript-pages of closing and rebuttal argument. 6-SER-1421-56, 1493-98.

---

[10] Garg quotes the government's statement that "some of the most damning evidence in the case was found" on Garg's phone (AOB-29), but neglects to explain that statement was made in a pretrial filing a year before trial, not to the jury. 3-ER-544. Garg's phone *did* contain damning evidence, but that does not mean it was the "centerpiece" of the government's trial presentation.

[11] Garg includes selective and improperly redacted pages of the transcript. *See* 4-ER-806-11. This Court's rules forbid such selective presentation. Even when citing only "certain pages of a long transcript," Garg must "provide enough surrounding pages to provide relevant context." Advisory Committee Note to Circuit Rule 30-1.4, n. (e). And redacting or otherwise sealing material in the record requires a motion justifying why the material must be protected "from public view." Circuit Rule 27-13(a). Instead, here and in other portions of his excerpts, Garg simply removes content he doesn't want the Court to see. *See, e.g.*, 4-ER-813-26, 878-83.

The full record shows that material from Garg's phone corroborated other evidence in the case but that excising it would not have changed the result. For example, Hefton testified credibly and repeatedly about Garg's physical abuse and anger. *See* 4-SER-874-75, 884, 926, 1017. Hutchins testified about Garg's anger, too, and said that Garg told her he suffered from IED. 1-SER-98, 103. The apartment's leasing manager was so concerned by Garg's anger in mid-2019 that she advised Hutchins to immediately seek a protective order. 1-SER-230. And the jury saw Garg's anger expressed in hundreds of harassing emails. Considering all this evidence, the addition of a WhatsApp message between Garg and Hefton where Garg wrote "Babe, I barely touched you. I'm trying to control my anger," although corroborating, surely did not tip the balance for the jury. 4-ER-886.

Likewise for the screenshot of his computer that Garg sent to Hefton via WhatsApp. 4-ER-896. That image confirmed what other forensic evidence already showed: Garg was logging in and out of stalker accounts from the same IP addresses and on some of the same devices that he was using to send emails from his true email account. *See* 5-SER-1034-54; *see also* Gov. Trial Exhibit 11; 6-SER-1518-19. Similarly, the

evidence of the "Hushed" application found on Garg's phone corroborated Hefton's testimony about his use of "burner phone apps," but it was just one piece of evidence among many others (for example, that Garg had to use his parents' phone numbers in India for email authentication codes because his burner phone apps wouldn't work for that). 4-SER-905. Although the government's timeline showing that the camera app on Garg's phone had been used while he was standing in the Tower 12 lobby (4-ER-884) certainly corroborated that Garg took and sent those photos to Hutchins, the jury could not have entertained reasonable doubts about that fact when faced with: 1) Hefton's testimony that Garg took and sent the photos while she waited in the car outside; 2) surveillance footage showing Garg walking around in the lobby while using his phone; 3) Garg's admission at trial that he was in the lobby; 4) recordings of Garg telling Hefton to hide the clothes he wore that day; and 5) the recovery of those clothes from his backyard.

The same is true of the burglary Garg staged. Even without the "blooper videos" from his phone, ample other evidence confirmed the events of that evening, including: 1) Hefton's detailed testimony about staging the break-in; 2) the security footage Garg emailed to Oliverson;

3) Oliverson's body-cam footage; and 4) forensic evidence of Garg scheduling emails at the exact time that Hefton was answering the door to the officer.

Garg ignores that, at bottom, the evidence from his phone either corroborated facts about which the jury could not have entertained any reasonable doubts, or else helped clarify which acts of harassment and stalking were committed by Garg and which ones may have also involved Hefton. But even if the jury had any questions on that score, those questions would have no bearing on Garg's convictions because the jury was correctly instructed under a *Pinkerton* theory of liability for Counts 2-4 and 6-8. 1-ER-93.

Suppressing the evidence from Garg's phone would have made no difference to the outcome of trial considering the "overwhelming evidence of [Garg]'s guilt," so that evidence was harmless beyond a reasonable doubt. *United States v. Shryock*, 342 F.3d 948, 979 (9th Cir. 2003). *Cf. United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000) (challenged evidence not harmless where, other than testimony from a "longtime criminal and drug dealer," the government's only other evidence "tying

the defendant to" the crime was the "illegally seized evidence from his bedroom").

Finally, the Court should reject Garg's cursory argument that other fruits of his arrest should also have been suppressed and that he made "other, independent arguments to suppress additional evidence." AOB-31-32. Garg faults the district court for not "making any findings" on these issues, which he included in his pro se suppression motion. AOB-32. But Garg ignores that the court acted within its discretion in deeming those claims untimely and in finding no good cause to allow him to raise them. *See* 1-ER-24-26, 68-69, 103-04. And Garg's other contentions are "unsupported by meaningful argument" so they are waived. *United States v. Stoterau*, 524 F.3d 988, 1003 n.7 (9th Cir. 2008); *see also* Fed. R. App. P. 28(a)(8)(A).

Most notably, Garg makes no attempt to show that any of the claims he tried to raise have merit. They don't. Even a passing review of Garg's argument about his fingerprints, for instance, shows that it is wrong. *See* 3-ER-598. As Garg admits, he was fingerprinted as part of the ordinary booking process after his arrest on November 1. *Id.* Unlike in the cases cited in his pro se motion, Garg's fingerprints were obtained

while booking him for crimes there was *already* probable cause to believe he had committed. *Cf. Davis v. Mississippi*, 394 U.S. 721, 723, 727 (1969) (officers had "neither a warrant nor probable cause for" petitioner's arrest, and his detention was "for the sole purpose of obtaining fingerprints" to try to connect him to a sexual assault); *Hayes v. Florida*, 470 U.S. 811, 814-15 (1985) (same).

In other words, Garg was not detained and fingerprinted in order to investigate him for unknown crimes. He was arrested based on probable cause that he had committed cyberstalking, fingerprinted as part of the booking process, and those fingerprints later served as further evidence confirming his guilt. Even if Garg's arrest was unreasonable because of the ruse (it wasn't), it was based on probable cause and was not done to obtain his fingerprints for investigatory purposes. His fingerprints aren't suppressible.[12] *See United States v. Parga-Rosas*, 238 F.3d 1209, 1215 (9th Cir. 2001).

---

[12] Garg also ignores that he was arrested again in February 2021 subject to a warrant, and would again have been fingerprinted, and then again fingerprinted when he was federally charged and transferred to federal custody in March. *See United States v. Ortiz-Hernandez*, 427 F.3d 567, 577-78 (9th Cir. 2005).

Garg also does not flesh out his claim that subsequent warrants were tainted by reference to his illegal arrest, the seizure of his phone, or his fingerprints (AOB-31), so the Court should not address it. *See Stoterau*, 524 F.3d at 1003 n.7. In any event, the applications in support of those warrants show there was probable cause to issue them without reference to Garg's first arrest, his phone, or his fingerprints. *See, e.g.*, 2-ER-170-180 (November 5, 2020 state warrant application with no mention of fingerprints and only brief mention that emails, text messages, and calls mostly ceased after Garg's arrest on November 1); 2-ER-197-203, 210-14 (February 26, 2021 state warrant application with no mention of fingerprints, evidence on Garg's phone, or reliance on the facts of Garg's arrest); 2-ER-230-322 (299-paragraph affidavit in support of federal search warrant in March 2021, with only one mention of fingerprints, *see* 2-ER-242, a short discussion of Garg's arrest, *see* 2-ER-251-52, and a statement that the affiant had "not viewed any evidence obtained from" Garg's phone, *see* 2-ER-285).[13] There is no basis for the

---

[13] *See also* 2-ER-374-87 (affidavit in support of renewed search warrant from September 13, 2021, with no new substantive information); 3-ER-407-14 (similar), 420-512 (same for search warrant application from September 2022).

Court to grant Garg's unsupported request to vacate and remand for de novo review of the admissibility of the remaining trial evidence.

## II. Garg's Sixth Amendment right to self-representation was not violated

### A. Standard of review

Violation of a defendant's Sixth Amendment right to self-representation is structural error. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). This Court has not, though, decided whether a claimed violation of this right is reviewed de novo or for abuse of discretion. *United States v. Engel*, 968 F.3d 1046, 1049-50 (9th Cir. 2020). Garg's claim fails even under de novo review.

### B. Garg was given a fair chance to present his case

Garg's Sixth Amendment argument is largely a repackaging of his complaints about the district court's procedural rulings after he chose to represent himself. It is also a red herring and rests on an incomplete recitation of the record. The Court should reject Garg's attempt to constitutionalize case-management issues in pursuit of a structural-error finding and should not reward his cherry-picking of the record. Garg was not excused from following procedural and substantive rules simply because he was pro se. *See Flewitt*, 874 F.2d at 675; *United States v.*

*Merrill*, 746 F.2d 458, 465 (9th Cir. 1984). And the record shows he had "a fair chance to present his case in his own way." *McKaskle*, 465 U.S. at 177. Indeed, Garg has not explained how the court's rulings prevented him from advancing any of his theories of defense. There was no structural error. *Cf. Engel*, 968 F.3d at 1052.

### 1. *Garg misrepresents the district court's responses to his filings*

The events leading up to Garg taking over his own defense have been detailed, as has the district court's proper exercise of its discretion not to reset the pretrial motions deadline. It bears repeating, however, that Garg was warned that the court would not reset that deadline simply because he chose to change counsel and eventually to represent himself, and that he would be held to the same standards as counsel. *See, e.g.*, 5-ER-961; 1-SER-20; *see also* 1-ER-25 ("He had the option to proceed *pro se* earlier but decided not to do so."), 43 (Garg "chose to proceed with counsel through the pretrial motions deadline" and did not state that he "disagree[d] with prior counsel's case strategy" until "*after* the Court ruled on his previous motions"); 5-ER-956, 958. Thus, in accordance with Rule 12(c)(3), the court required Garg to first show good cause to file any "additional pretrial motions" (1-ER-26), unless "for purely ministerial

requests" stemming from "the challenges that arise from self-representation while incarcerated." 1-ER-43.

Garg now claims that this good-cause requirement deprived him of his right to self-representation, listing various pro se pretrial motions the district court struck or denied. *See* AOB-35-40. But Garg repeatedly omits key details from the record that undermine his claim and does not explain how any of the court's rulings prevented him from advancing his chosen defenses.

For example, Garg makes much of the fact that in January 2023, the district court "denied six motions for pretrial subpoenas" for "failure to first file a motion explaining why good cause existed to file them after the lapse of the pretrial motions deadline." AOB-35 (citing 1-ER-27). What Garg does not tell this Court (or include in his excerpts) is that in August 2023, the district court revisited the issue and *granted* several of Garg's requested subpoenas. 1-SER-2. And in denying the others, the court did not rely just on their untimeliness but also explained that Garg had failed to satisfy the factors set forth in *United States v. Nixon*, 418 U.S. 683, 699-70 (1974), for subpoenas under Fed. R. Crim. P. 17(c). 1-SER-3-8; *see also* 1-SER-4 (Rule 17(c) "is not intended to provide a means

of discovery in a criminal case" (quoting *United States v. George*, 883 F.2d 1407, 1418 (9th Cir. 1989)). In other words, Garg *received* some of the material he sought via subpoena, and where he didn't, it wasn't because the district court bound him to decisions by prior counsel but because Garg's requests had no merit.

Similarly, Garg argues that the court denied his motion to compel disclosure of the full names and contact information of his victims for lack of good cause because Camiel could have filed such a motion. AOB-37. True enough, but Garg ignores that the court *also* found that even if timely, the motion "fails on the merits." 1-ER-52. *See also id.* (finding there was no indication the government "tried to hide any witnesses" or withhold exculpatory evidence, and that under the local rules witness lists are not due from the prosecution until 14 days before trial).

Garg also asserts that the district court improperly denied his motion to compel information relating to discovery that Camiel had not received until after the pretrial-motions deadline. *See* AOB-37-38. Garg's request, filed in late-February 2023, related to search protocols for the two cellphones the government recovered from behind Garg and Hefton's shed in August 2021 (*see* 3-ER-526), for which Camiel did not receive

extraction reports until October 2022. 6-ER-1193-1201. Garg faults the court for finding no good cause to allow his late motion because Camiel received extraction reports from other devices before the pretrial motions deadline and so could have challenged the government's search protocols in his motion to suppress but chose not to. *See* AOB-38; 1-ER-56-57.

Garg omits that, as the government pointed out (*see* 1-SER-33), to the extent material was extracted from those phones, it was reviewed by a filter team to separate privileged from non-privileged material. The material was then placed on the hard drive of discovery delivered to Garg after he began representing himself so that he could "confirm[] the filter team's privilege determinations." *Id.* Garg had not confirmed his review of the material, so it had "not been released to the prosecution team or reviewed by the prosecution team's forensic expert." *Id.*

In other words, when Garg moved to compel search-protocol information for these phones, the prosecution team had not yet forensically searched them "and it [wa]s impossible for the government to produce the nonexistent discovery Garg" requested.[14] 1-SER-35. Given

---

[14] Notwithstanding Garg's statement that he needed search-protocol information to challenge agent testimony at trial, *see* 6-ER-1195, (continued . . .)

that fact, it is hard to understand Garg's argument that denying this motion to compel violated his constitutional rights.

Garg also describes the events leading up to the court granting his renewed motion for a computer expert in June 2023 (*see* AOB-38-39), but it is unclear why. He complains that the court authorized only $2,800 for an expert but does not actually argue that sum was insufficient or otherwise prevented him from presenting his defense. Then, Garg again elides the record by stating that in January 2023, the court "denied … requests for funds in excess of $800 for investigator and paralegal." AOB-38 (citing 1-ER-40). In fact, the cited order explained that Garg could "move [ex parte] for additional funds" but would need to explain how funds had been used to date and "the specific purpose of the additional funds, *i.e.*, what investigatory work not yet conducted by prior counsel that they would support."[15] 1-ER-40. Rather than creating a "catch-22"

_____

no data from either phone was presented at trial. When asked about one of the phones, the government's analyst testified he never forensically reviewed it because his "understanding was the device had been reset, and, also, [he] did not receive permission to look at the privileged review package." 5-SER-1177.

[15] Because Garg filed his funding motions ex parte, the government does not know the total funding provided. Doubtless, Garg would have

(continued . . .)

(AOB-47), the record shows that the court entertained many of Garg's discovery motions and it granted some of them. The government abided by its ongoing discovery obligations (*see, e.g.*, 1-SER-33), and Garg rightly had to show good cause to file untimely pretrial motions as Rule 12(c)(3) requires.

Instead of making any serious attempt to show that the court's rulings prevented him from meaningfully defending himself, Garg simply states that his brief does not contain "an exhaustive list of motions struck, deferred, or denied." AOB-42. That does not carry Garg's burden here.[16] Presumably, Garg has included what he thinks are the strongest examples to support his claim, yet his examples do not survive even

_____

included this information in his brief if it supported a claim that lack of funding prevented him for presenting his defense.

[16] The government does not suggest that harmless-error analysis is appropriate. But Garg still must draw a connection between the court's rulings and *how* they allegedly prevented him from meaningfully defending himself. The structural-error standard means that Garg need not show that his chosen defenses would have succeeded; it does not mean this Court must assume the existence of defenses that Garg was prevented from raising. *Cf. United States v. Rice*, 776 F.3d 1021, 1026 (9th Cir. 2015) ("Because there was no Sixth Amendment violation, there was no structural error.").

passing scrutiny. Garg has not plausibly shown that the district court's rulings deprived him of his Sixth Amendment rights.

The cases Garg cites make that point clear. *See* AOB-44-48. In *United States v. Farias*, for instance, the trial court told the defendant it would not grant a continuance after he asked to represent himself the day before trial, so the defendant instead proceeded with counsel. 618 F.3d 1049, 1050-51 (9th Cir. 2010). This Court held that "leading [the defendant] to believe he would not have adequate time to prepare himself for trial … amounted to the outright denial of his request to proceed pro se." *Id.* at 1052. *Armant v. Marquez* involved a similar denial of a continuance with similar results. 772 F.2d 552, 554 (9th Cir. 1985). In *Engel*, the trial court revoked the defendant's right to represent himself mid-trial. 968 F.3d at 1049. These are clear examples of courts preventing defendants from representing themselves *altogether*. But nothing like that happened here.

*Milton v. Morris* also does not help Garg, because it, too, addresses a complete denial of the right to self-representation. 767 F.2d 1443 (9th Cir. 1985). There, the incarcerated defendant was "isolated from *any* means to prepare" for trial, was "denied communication with the outside

73

world," and had no "access to research materials, advisory counsel, means to serve subpoenas, or effective use of a telephone." *Id.* at 1445-47 (emphasis added). *See also id.* at 1446-47 (defendant "lacked all means of preparing and presenting a defense, and was unjustifiably prevented from contacting a lawyer"). There was thus no question the defendant was functionally unable to mount any meaningful defense.

Here, by contrast, the district court ordered that Garg be given, among other things: a laptop with discovery documents and 40 hours of computer time per week; investigative and paralegal services; the ability to electronically serve filings on the government; 200 pages of free photocopying per month; once-a-month two-hour in-person meetings with his computer expert; two phone calls to potential defense witnesses per month that BOP would monitor but would not share with the prosecution team; and stamps, envelopes, pens, notebooks, and typewriter ribbons and correction tape.[17] *See* 5-ER-1033-38. The court also addressed ongoing requests for further accommodations and supplies. *See, e.g.*, CR-639, 787. Despite the security and resource

---

[17] Understandably—considering the nature of the case—Garg was not granted internet access (5-ER-1037) or email capabilities beyond the detention center's Trulincs system (*see, e.g.*, 5-ER-1167).

constraints of incarceration, Garg had extensive tools at his disposal—far more than this Court has deemed sufficient in other cases (even similarly complex ones). *See, e.g.*, *United States v. Sarno*, 73 F.3d 1470, 1491-92 (9th Cir. 1995) (120-140 hours of law library access and 20 hours to inspect 250,000 pages of discovery was sufficient when "balanced against institutional "resource constraints"). And even a cursory review of the more than 80-page district court docket reveals how *very* many motions Garg was successfully able to file while in pretrial detention. *See* 9-ER-912-95.

In sum, Garg's inaccurate recitation of the record and selective quotes from caselaw do not establish that he was denied the right to meaningfully represent himself. Instead, the record shows a district court managing a docket that was rapidly metastasizing at Garg's hands while also reasonably assuring Garg's Sixth Amendment rights. Garg's assertion that he was prohibited from "filing any motion his prior counsel could have filed" (AOB-45) is wrong as a factual matter and legally would be permissible under Rule 12(c)(3) as to almost all his motions absent a showing of good cause. But in any event, Garg has not explained how the

court's rulings actually prevented him from "present[ing] his case in his own way." *McKaskle*, 465 U.S. at 177.

### 2. The court did not prevent Garg from conferring with a computer expert

Here, again, Garg's recitation of the record is misleadingly selective. Garg's delay in conferring with a computer expert between November 2022 and February 2024 was largely of his own making. The Sixth Amendment does not entitle an incarcerated pro se defendant to "unlimited" access to witnesses. *Sarno*, 73 F.3d at 1491. Instead, the right of access is "balanced against the legitimate security needs or resource constraints of the prison." *Id.* Considering those constraints, Garg was given reasonable opportunities to engage and work with an expert during almost a year-and-a-half of his time in pretrial detention. That he ultimately was unsuccessful in doing so because he repeatedly failed to follow institutional and court procedures does not make out a violation of Garg's Sixth Amendment rights.

On November 17, 2022, shortly after he began representing himself, Garg filed a motion for appointment of a computer expert, stating that prior counsel's expert would not work with pro se defendants. 11-ExParteER-2245-49. Although Garg neglects to say so here, the

district court granted Garg's motion six days later, directing that Garg could "work with standby counsel to identify a computer expert who can assist him with the preparation of his defense." 5-ER-1035.

Three months passed with no apparent action by Garg. Then, in February 2023, Garg moved the court to appoint an expert he had chosen, and to approve, as an "initial estimate," $7,500 in funding. 11-ExParteER-2269-70. Garg stated the expert was "quintessential to [his] defense" but provided no other detail. *Id.* A month later, the court denied Garg's motion "at this time," finding that Garg failed to "explain why an additional expert [wa]s necessary" considering that his prior counsel's expert had "presumably performed a detailed analysis of the devices at issue." 1-ER-49.

Garg renewed his motion in April, this time outlining what prior counsel's expert had done and what remained to be done. 11-ExParteER-2278-93. The court granted Garg's motion in June, reiterating that it had denied Garg's February request because Garg had not "explain[ed] why such additional services were necessary," and it approved $2,800 per the Court's General Order governing CJA counsel and service providers. 1-ER-58. Then, in July, Garg tried—unsuccessfully—to designate himself

77

as his own computer expert, which caused further rounds of briefing and delay. *See* CR-653, 683, 709.

Two months after that, in September 2023, having now retained an expert (*see* CR-732), Garg filed a notice claiming that BOP had failed to comply with the court's November 2022 order respecting procedures for contacting defense witnesses. 6-ER-1258-60. Garg's notice revealed that he gravely misunderstood that order, a misunderstanding that persisted despite the government's repeated efforts to clarify matters for Garg, and which led to the further delays about which Garg now complains.

In its 2022 order, the court addressed Garg's request for "two unmonitored phone calls to potential defense witnesses each month." 5-ER-1035-36. Considering potential security problems, the court adopted the government's alternative solution whereby Garg would "identify to BOP and the Government the two calls he intends to make to potential witnesses" and BOP would "then be required to refrain from informing the prosecution team about the content of these calls." 5-ER-1036. *See also* 1-SER-42 (explaining that Garg's calls would "be monitored, just as all inmate [non-legal] telephone calls are monitored,"

but that BOP would not inform the prosecution about the content of the calls or produce recordings of them).

Ignoring this process, Garg's September 2023 notice made clear that instead, he told BOP staff that the court "had instructed FDC SeaTac to setup a[n] unmonitored phone line for [him] to call defense witnesses." 6-ER-1260. But that is *not* what the court had ordered, and Garg's repeated incorrect requests unsurprisingly caused the institution a great deal of confusion. *See, e.g.*, 6-ER-1285-87.

The government tried to alleviate this confusion in an email to Garg's paralegal on September 29, 2023, explaining: "Contrary to your representation, the Court's [November 2022] Order did not order 'an unmonitored phone line in the visitation room for [Garg] to call defense experts or investigators.'" 6-ER-1297. The government then explained the procedure the court *had* ordered, and advised Garg: "If you notify your unit team of the witnesses you intend to call, in advance of a call, the unit team will work to ensure the numbers are approved and … ensure that the content of these calls is not to be disclosed to the prosecution team." 6-ER-1298.

Rather than heeding this explanation, Garg "tried to add [his] defense expert and investigator to the [unmonitored] legal phone," which BOP policy prohibited. 6-ER-1303. On October 2, the government again explained the proper procedure to Garg's paralegal, this time copying BOP staff members and legal advisors. 6-ER-1302. Yet, a week later, Garg's paralegal again asked that Garg be given the "ability to call [his expert] … using the CJA phones." 6-ER-1286.

After more back and forth over several more weeks (*see* 6-ER-1284-85), on December 4, 2023, BOP confirmed that it had scheduled a call between Garg and his expert for December 11 (Garg omits this fact from his brief). 6-ER-1284. That call apparently did not happen because Garg's expert witness would not make himself available at the scheduled time. 6-ER-1283. Garg's standby attorney then asked, again, for the expert to be added to the unmonitored legal line, and BOP again explained it could not add non-attorneys to that line. *Id.*

Finally, on December 29, 2023, Garg moved for an order directing BOP "to add defendant's computer expert on the legal phone," and claimed that the government had "done nothing to fix the issue." 6-ER-1273, 1275. The government responded on January 5, outlining what the

80

court had ordered more than a year earlier and how Garg had failed to follow those procedures. 6-ER-1289-91. The government explained that BOP "rules limit use of the legal phone to calls to lawyers and paralegals," but that the government did not oppose Garg's request and that BOP indicated it would comply with Garg's request under court order. 6-ER-1288-89. Garg did not file a reply until January 29, in which he accused the government, without any valid basis, of "mislead[ing] the court" and telling "outright lies." 6-ER-1305-06.

Two weeks later, in mid-February 2024, the district court granted Garg's motion as to the legal phone and ordered BOP to allow Garg a two-hour video conference with his expert. 1-ER-62-64. Garg apparently took no steps to arrange either a call or video conference in the two weeks remaining before the expert disclosure deadline. 1-ER-81; *see also* CR-847-1 at 11-12. Trial began a month later. 1-ER-80.

Contrary to Garg's recitation, this record shows that he was given reasonable opportunities to confer with a computer expert but repeatedly failed to avail himself of them. But even if that were not so, Garg does not explain how this deprived him of a fair chance to present his case—that is, what defense theories he wanted to raise but couldn't. To show a

Sixth Amendment violation, Garg must do more than gesture at hypotheticals.

*   *   *

Accounting for his selective presentation of the record, Garg has not shown that he was unable to meaningfully exercise his Sixth Amendment rights. Garg's self-representation was vigorous, to say the least, albeit ultimately unsuccessful. The Court should not credit Garg's attempt now to twist the record to show structural error where there was none.

## III. The district court did not err in denying Garg's motion to reinstate the government's plea offer

### A. *Standard of review and legal standard*

This Court reviews claims of ineffective assistance of counsel de novo. *United States v. Osorio-Arellanes*, 112 F.4th 647, 657 (9th Cir. 2024). The district court's factual findings are reviewed for clear error. *Id.*

To establish ineffective assistance of counsel in plea proceedings, the defendant must show that counsel's representation fell below an objective standard of reasonableness and that the outcome of the plea process would have been different with competent counsel. *Lafler v. Cooper*, 566 U.S. 156. 163 (2012).

### B. The record does not support Garg's claim—raised only after he saw the strength of the digital evidence—that he was misadvised, nor shows a reasonable probability of a different outcome

Garg's ever-shifting position on whether to accept a plea offer generated a complex and confusing record. But two things are clear: first, the district court did not clearly err in finding that Camiel advised Garg that he potentially faced a Guidelines range of 210-262 months (1-ER-72); and second, Garg refused to believe he would face any of the ranges Camiel discussed with him and only changed his mind after accepting that the government had overwhelming and incontrovertible digital evidence of his guilt. Considering this record, the district court was right to conclude that Camiel's representation was constitutionally adequate and to deny Garg's motion to reinstate the 48-month plea offer.

#### 1. The course of plea negotiations

In February 2022, Camiel sent Garg a letter with his "preliminary calculation" of sentencing exposure. 10-SealedER-2002, 2019. The letter explained that counts involving five victims would result in a total offense level of 27 and a sentencing range of 70-87 months, assuming no acceptance of responsibility. *Id.* That preliminary calculation "did not factor in" that Hefton had begun cooperating and was providing

statements supporting an upward role adjustment for Garg. 10-SealedER-2002.

After the government sent a formal plea proposal on April 7, 2022, discussing a potential range of 51-63 months (assuming acceptance of responsibility) (7-ER-1502), Camiel told Garg that if he went to trial, he would likely face a number of enhancements not included in Camiel's preliminary calculation, including an upward role adjustment, an obstruction enhancement, and an official-victim enhancement. 10-SealedER-2003. Camiel's new calculation was informed by his review of digital evidence received from the government's filter team that the prosecutors had not yet seen. 10-SealedER-2004. During an in-person visit, Camiel told Garg that his "likely offense level following a trial would be 37." *Id.* Camiel had a copy of the Guidelines with him and showed Garg the sentencing table, pointing out that his range would be 210-262 months. *Id.*

Garg nevertheless directed Camiel to continue negotiating and by mid-July they secured a 48-month offer. 10-SealedER-2004-07. Camiel advised Garg to accept it because, based on his review of the discovery, the "evidence against [Garg] was overwhelming, even if the Court were

to grant a planned suppression motion." 10-SealedER-2007. Although he had originally proposed it, Garg refused the offer because he believed it was "too much time." *Id.*

On August 1, Camiel wrote a letter documenting his plea discussions with Garg and asked Garg to sign it—something Camiel had never done before. 10-SealedER-2008. Camiel believed Garg was making a decision that "he would regret," and explained in the letter that Garg's chances of success at trial were "quite remote" and if convicted he would "likely face a substantially longer prison term." *Id.*; *see also* 10-SealedER-2043-44. Camiel also advised that the government planned to recommend the top end of the sentencing range after trial and intended to supersede the indictment with more counts and victims. 10-SealedER-2043. Garg refused to sign the letter. 10-SealedER-2008. Plea negotiations continued. 10-SealedER-2008-10.

On August 2, 2022, the government emailed Camiel confirming that Garg would likely receive a leadership enhancement and his sentencing range would be at least 87-108 months. 7-ER-1521. Camiel showed that email to Garg. 10-SealedER-2009. During a meeting over the weekend of August 6, Camiel again told Garg that the sentencing range "would be

much higher if he were convicted at trial" and he would face "a much longer sentence." 10-SealedER-2010. Garg responded that "he did not believe that certain Guidelines adjustments, including the official victim enhancement, would apply." *Id*.

After floating several other plea scenarios (*see* 7-ER-1523-46), Garg finally rejected all outstanding offers on August 10. 7-ER-1548. By August 31, the prosecutors had completed their initial review of the materials from the filter team. 7-ER-1555. Because that review revealed "irrefutable digital evidence" of Garg's guilt on Garg and Hefton's devices, the government reached out again with a new, slightly less favorable plea offer of 60 months. 7-ER-1555-56. The government detailed some of the incriminating digital evidence and noted it was "difficult to see what viable defense" Garg could mount. 7-ER-1556.

This seemed finally to sway Garg, who directed Camiel to ask if the government would reinstate its 48-month offer. 7-ER-1559. The government declined, and on September 12, Garg refused the 60-month offer. Five days later, Camiel filed Garg's suppression motion.

2. *Garg's later representations about Camiel's advice*

Garg's remorse at having turned down the 48-month offer, first apparent after he saw the scope of the government's forensic evidence at the end of August, was again manifest after the district court denied Camiel's suppression motion. At the October 2022 hearing to remove Camiel, Garg complained about his inability to review the digital discovery, explaining that Camiel "didn't find what the Government found," and had told him the government "found it" because it "has various tools and various technology." 11-ExParteER-2222. Arguing that he shouldn't be penalized for Camiel's alleged discovery failures, Garg said: "Your Honor, I will take the four [years] right now." 11-ExParteER-2223, 2234.

Nine months later, in July 2023, Garg moved pro se for "relief from vindictive *Faretta* penalty and to preserve *Lafler* issue," arguing that the government was increasing its estimate of his sentencing range to punish him for representing himself and that the 48-month offer should be reinstated. 7-ER-1445-58. Garg again focused on his earlier inability to review digital discovery, asserting that in August 2022 he told Camiel that "had [he] known [the extent of the government's] forensic evidence,

87

[he] would have accepted the 48 month agreed deal." 7-ER-1448. Garg admitted that Camiel had advised him "against rejecting the four year offer," and that the "plea issues started on August 31, 2022" when the government "delineat[ed the] forensic evidence on" his devices. 7-ER-1450. Garg stated that if Camiel had told him that his "sentencing exposure was 168-210 months then [he] definit[e]ly would have taken the 4 year offer." 7-ER-1456. In his reply, Garg repeated this assertion (*see* 7-ER-1581) but then wrote that he "was willing to accept the [48-month] offer" as soon as he grasped the forensic evidence against him, and his lack of understanding of his sentencing exposure "simply bolster[ed]" that claim. 7-ER-1588.

> 3. *The district court did not clearly err in its factual findings, and it correctly denied Garg's motion to reinstate the plea offer*

After full briefing, the district court denied Garg's request to reinstate the plea offer. 1-ER-70-73. It concluded that, "in light of the record as recounted, there is no reasonable probability that any additional advice Mr. Camiel might have given Defendant about his sentencing exposure would have led him to accept the Government's plea proposals." 1-ER-72. Citing Camiel's declaration, the court found it

"abundantly clear" that Camiel "advised Defendant of a higher sentencing range were he to reject the Government's plea and proceed to trial." *Id.* The court found Camiel's February 2022 letter to Garg preliminarily calculating a sentencing range of 70-87 months "could not be clearer in articulating this exact opinion." 1-ER-73. "Yet," the court continued, Garg "consciously chose to ignore [Camiel's] advice." *Id.*

The court also found Camiel specifically advised Garg that if he went to trial, "his sentencing guidelines would be at a much higher range of 210-262 months." 1-ER-72 (citing Camiel's declaration at 4-5). The court then stated, "Mr. Camiel sent Defendant a letter stating this exact opinion," again citing Camiel's February 2022 letter. *Id.* This letter did not mention the 210-262-month range. 10-SealedER-2019.

Garg suggests this latter statement means all the court's findings about Camiel's performance are clearly erroneous. AOB-63-65. But at best, this statement shows the court made a mistake in describing what Camiel wrote in the February letter (as opposed to communicated orally during an ensuing in-person meeting). Considering the full record, that mistake does not undermine the court's overall findings. *See, e.g.*, *United States v. Gust*, 405 F.3d 797, 799 (9th Cir. 2005) (clear-error

review is "significantly deferential" and so long as "the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if the reviewing court would have weighed the evidence differently" (internal quotation marks and citation omitted)).

Camiel swore that he communicated the potential range of 210-262 months to Garg in person and showed him the sentencing table in the Guidelines manual. 10-SealedER-2003-04. And the court cited Camiel's declaration describing this interaction in finding that Camiel told Garg about the 210-262-month range—not Camiel's February letter.[18] 1-ER-72. The district court's finding that Camiel so advised Garg was more than plausible on this record; therefore, this Court must uphold it.[19] *See Gust*, 405 F.3d at 799; *see also United States v. Bussell*, 504 F.3d 956, 962 (9th Cir. 2007) ("To be clearly erroneous … a decision must strike us [as]

---

[18] Garg again overstates the record, asserting that the district court "denied the motions based on its factual determination that Camiel advised Garg in writing" about the range of 210-260 months. AOB-58. That is not what the court's order says.

[19] Garg does not claim that the district court was required to hold an evidentiary hearing before ruling on his motion (*see* AOB-59-65) and he cannot raise that issue for the first time in reply. *See Anekwu*, 695 F.3d at 985.

more than just maybe or probably wrong; it must … strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. No such stench lingers here." (internal quotation marks and citation omitted)).

Even if "one disregards" the court's misstatement about the February 2022 letter, this record is not "devoid of evidence" to show that Camiel sufficiently advised Garg about his potential sentencing exposure. *Gust*, 405 F.3d at 804. To the contrary, the record includes: Camiel's description of showing Garg the sentencing table at 210-262 months; telling Garg, after reviewing digital discovery from the filter team, that "'now' was the time to settle the case—before the government had access to this additional evidence, which would strengthen its case and bargaining position"; advising Garg that "the evidence against him was overwhelming, even if the Court" suppressed some of it; and, in addition to the February 2022 letter, preparing another letter (which Garg refused to sign) clearly stating that Garg's sentence would be "substantially longer" if he went to trial, including because the government would seek the top rather than the bottom of the sentencing range and because the government planned to supersede with more counts. 10-SealedER-2003-04, 07-08. The district court's factual findings

drawn from this record were not clearly erroneous simply because the court misspoke in one instance about one letter.

Aside from the court's reference to that letter, Garg's argument otherwise rests on a purported lack of evidence. For example, Garg complains that "no *other* letter in the record" discussed a range of 210-262 months. AOB-58. But that is unsurprising given that Camiel advised Garg of this in person. Garg also points to Camiel's statements during the October 2022 hearing on his motion to withdraw, faulting him for "*not* disput[ing]" Garg's statements that when he turned down the 48-month offer, he "understood his post-trial guideline range to be 87-108 months" and that Camiel had "just recently told Garg the range would exceed 120 months." AOB-52-53. That, too, is unsurprising considering the hearing was to determine whether Camiel should be allowed to withdraw, not about whether Camiel was ineffective, and Garg's statements focused almost entirely on his frustration with discovery.[20] *See* 11-ExParteER-

---

[20] Garg now faults the magistrate judge for "not immediately seek[ing] to determine whether Camiel's deficient advice had prejudiced Garg in plea negotiations." AOB-53. But the court gave Garg what he asked for at the hearing—it "relieved Camiel and appointed new counsel." *Id.* It would have been plainly improper for the court to inquire into plea negotiations, *see* Fed. R. Crim. P. 11(c)(1), and the court had no

(continued . . .)

2208-32. Simply pointing out a lack of *more* evidence does not contradict Camiel's declaration; it is certainly insufficient to show that the court's factual findings are clearly erroneous or to carry Garg's burden of showing that Camiel's "representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

As the district court correctly concluded (1-ER-72), Garg also has not shown prejudice. Garg refused to accept *any* of Camiel's sentencing calculations, and even after asking Camiel for the "worst case" scenario—after Camiel had warned about a possible 210-262-month range—Garg's response was that "he did not believe that certain Guidelines adjustments, including the official victim enhancement, would apply." 10-SealedER-2004, 2010. Rather than listening to Camiel's advice, Garg fixated on the ranges in the government's plea letters,[21] sentences in

_____

basis to sua sponte make findings about the constitutional effectiveness of Garg's counsel. *Cf. United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013) (decision whether to address a pre-judgment ineffectiveness claim "is best left to the discretion of the district court").

[21] Garg conflates the questions of what range the government (at times mistakenly) thought would apply and what range Camiel advised Garg could apply. *See, e.g.*, AOB-54-57. But as to whether Camiel's assistance was ineffective, the latter question is the relevant one. That the government underestimated Garg's sentencing range and Camiel

(continued . . .)

comparator cases, and his (ultimately vain) hope that he could get away with what he had done because the government might not recover sufficient digital evidence from his devices. *See, e.g.*, 8-ER-1647-48 (Garg stating that in early August he was "completely unaware of the problematic forensic evidence against" him).

Garg now claims that "as soon as he learned" his range "would exceed even 10 years," he "immediately and consistently expressed he would accept the 48-month offer." AOB-58-59; *see also* AOB-62 ("he had been saying the same since at least October 13, 2022"). This claim is demonstrably false: months before the 48-month offer came, Camiel had already advised Garg his sentencing range could exceed 20 years. 10-SealedER-2004-06. And it ignores Garg's reaction to the government's August 31 email outlining the damning digital evidence it had just reviewed. 11-SealedER-2012. *That* was the point when Garg developed buyer's remorse and began to seriously entertain a 48-month plea that no longer was available. *Id.*; *see also* 7-ER-1448, 1450 (Garg's admission that the "plea issues started on August 31, 2022"). On this record, the

correctly suggested a higher one merely confirms that Camiel effectively advised Garg.

94

district court did not clearly err in finding there was "no reasonable probability" that any additional advice Camiel might have given Garg about his sentencing exposure "would have led him to accept the Government's plea proposals." 1-ER-72. This finding foreclosed Garg's ineffectiveness claim. *See Hill v. Lockhart*, 474 U.S. 52, 60 (1985).

## IV. The jury was correctly instructed on the cyberstalking counts

### A. *Standard of review*

This Court reviews the formulation of jury instructions for abuse of discretion but reviews de novo "'whether the jury instructions misstated an element of the crime.'" *United States v. Kirst*, 54 F.4th 610, 624 (9th Cir. 2022) (citation omitted). If the defendant "did not object to the district court's instruction below, [the Court] review[s] for plain error." *United States v. Jaimez*, 45 F.4th 1118, 1129 (9th Cir. 2022). *See also* Fed. R. Crim. P. 30(d). Under that standard, the defendant must show error; that was plain, in that it was "clear or obvious, rather than subject to reasonable dispute"; and that the error affected his substantial rights, which generally means he must show that, but for the error, the outcome would have been different. *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citations omitted). This Court then has discretion to remedy the

error but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

### B. *Garg misunderstands* Counterman v. Colorado *and ignores this Court's binding caselaw on 18 U.S.C. §2261A(2)*

Garg argues that under *Counterman*, to convict him of cyberstalking under 18 U.S.C. §2261A(2), the jury had to find that he communicated true threats and that he consciously disregarded a substantial risk that his communications would be viewed as threatening violence. AOB-65-69. Garg was wrong when he made that argument to the district court (1-ER-78-79, 87-88), and he is wrong again now.

*United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014), which Garg neglects to cite in his brief, squarely controls. *Osinger* explained that §2261A(2) survives scrutiny under the First Amendment because, by its terms, it proscribes harassing and intimidating *conduct*, not speech. *Id.* at 944. Specifically, it "criminalizes 'a course of conduct that … causes … substantial emotional distress to [the harassee].'" *Id.* (citation omitted). This Court concluded that "the proscribed acts are tethered to the underlying criminal conduct and not to speech." *Id.* And because the statute requires the defendant to have acted with "malicious intent" in a

way that causes "substantial harm" to the victim, the Court reasoned "it is difficult to imagine what constitutionally protected speech would fall under these statutory prohibitions." *Id.* The Court also held that the nature of the speech involved in cyberstalking is "'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress" to the victim, and that the Supreme Court has carved out such speech from First Amendment protection. *Id.* at 946-47.

In other words, this Court, for two reasons, has rejected an interpretation of §2261A(2) limited to true threats. Garg's cyberstalking convictions did not require proof that he threatened his victims, let alone made any true threats. His convictions required proof that he intended to harass or intimidate his victims and engaged in a course of conduct capable of causing them substantial emotional distress. 18 U.S.C. §2261A(2). The district court did not err in delivering a jury instruction to that effect (1-ER-94), and it was not required to give the instruction Garg requested (1-ER-78).

This Court has already recognized (albeit in unpublished decisions) that *Counterman* has not changed the analysis under *Osinger*. *See United States v. Crawford*, No. 23-2532, 2025 WL 1248825, at *1 (9th Cir.

Apr. 30, 2025). *Counterman* "instructs that if a defendant is being prosecuted for threatening speech," the First Amendment requires proof that the defendant had "'some subjective understanding of the threatening nature of his statements,'" and "'that the minimum mens rea for this subjective intent is recklessness.'" *Id.* (citation omitted). But this Court recognized in *Crawford* that cyberstalking under §2261A(2) is meaningfully different from the state crime charged in *Counterman*, which made it unlawful to "repeatedly … make[] any form of communication with a person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person … to suffer serious emotional distress." *Counterman*, 600 U.S. at 70 (quotation marks and citation omitted). The *Crawford* Court held that §2261A(2)—"the cyberstalking statute at issue here and in *Osinger*"—"criminalizes conduct or speech that is harassing or intimidating" and "[t]hat conduct or speech need not involve true threats." 2025 WL 1248825, at *1. As a result, "*Counterman* is not clearly irreconcilable with *Osinger*."[22] *Id.* This Court has also held that even

---

[22] As noted, Garg fails to cite *Osinger* at all, let alone show how it is irreconcilable with *Counterman*. He cannot try to do so in his reply brief. *See Anekwu*, 695 F.3d at 985.

assuming "true-threats case law applied" to cases charging violations of §2261A(2) after *Counterman*, the fact that a jury must find the defendant "subjectively had the intent to 'kill, injure, harass, [or] intimidate'" imposes a "'mental-state element' that survives a First Amendment challenge." *United States v. Isho*, No. 22-10150, 2024 WL 135247, at *1 (9th Cir. Jan. 10, 2024).

Considering *Osinger* and this Court's post-*Counterman* decisions, the jury here was correctly instructed on the elements of §2261A(2). And the trial evidence overwhelmingly proved those elements. Garg impersonated Hutchins, Gonzalez, and others online, creating fake social media accounts in their names. Repeatedly, he made hang-up phone calls, and he sent his victims an unending stream of emails and texts. He scheduled a real-estate appointment for Ernsdorff and opened various accounts in Ernsdorff's name. He posted fake reviews to Google about Blair. He falsely reported Hutchins and Gonzalez for crimes. He staged a burglary at his home to frame Gonzalez. He put photographs in his own mailbox and then accused Hutchins and Gonzalez of planting them. He filed for restraining orders and other legal process against his victims. He timed the arrival of pre-scheduled harassing emails so that he could

use them to convince police he was innocent. And he went to the lobby of Tower 12, where he took photos and sent them to Hutchins. All this easily evinces Garg's intentional, harassing, and intimidating course of *conduct* capable of causing substantial emotional distress.

Garg's other jury-instruction claim fares no better. *See* AOB-69-70. Garg did not object to Instruction No. 19—dealing with stalking in violation of a criminal order—when the district court took exceptions from the parties (*see* 1-ER-94-95, 87-89), so his claim now is reviewed only for plain error. *See United States v. Ehmer*, 87 F.4th 1073, 1119 (9th Cir. 2023). Garg must show, among other things, that the instruction was plainly erroneous (he does not seriously try), and that the asserted error prejudiced his substantial rights. He cannot do so here, considering the mountain of incriminating evidence.

The protection orders Garg violated were filed on November 10, 2020. 8-SER-2015-19. Even if Garg is correct that the court should have instructed the jury to determine "whether the *offense* [charged in Counts 2-4] was committed in violation of" a criminal protection order rather than whether his "*conduct* violated a" criminal protection order (although Garg does not support this claim with much explanation or any case law

showing that the district court erred, *see* AOB-69-70), the outcome would have been the same.

Garg argues now that "the jury was permitted to consider months of conduct before November 10, 2020, and was required to find only *one act*" after that date, but "the statute required the jury to find two or more such acts" after November 10. AOB-70. The jury saw evidence that Garg sent *scores* of harassing and threatening emails to Hutchins, Gonzalez, and Zigler after November 10. *See, e.g.*, 7-SER-1619-21, 1624, 1633-62, 1680-81. Considering this evidence, there is no serious dispute that the jury still would have convicted Garg of Counts 2-4 under his proposed instruction. Accordingly, even if Garg could show the district court plainly erred in instructing the jury on those counts, he cannot show his substantial rights were affected, nor that the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

## V. Garg's challenge to Count 8 fails

### A. *Standard of review*

When a defendant properly challenges an indictment before trial, this Court reviews the district court's resulting decision de novo. *United States v. Qazi*, 975 F.3d 989, 992 (9th Cir. 2020). A district court's

decision not to grant an exception to a Rule 12 waiver is reviewed for abuse of discretion. *Tekle*, 329 F.3d at 1113.

### B. Garg's challenge to Count 8 was untimely and meritless

Seven months after the court's pretrial deadline, Garg filed a pro se motion to dismiss Count 8 of the superseding indictment, which charged him under §2261A(2) based on his harassment of Ernsdorff. *See* 1-ER-12-13; 9-ER-1828-33. The government opposed. 9-ER-1835-66. The court acted within its discretion in striking Garg's motion without addressing the merits both because it was untimely (*see* Fed. R. Crim. P. 12(b)(3), (c)(1)) and, as the court explained (1-ER-55), because it was filed in violation of the docket-management order limiting Garg to one motion per week. *See* 1-ER-46. Garg moved to reinstate his motion in July 2023, after the Supreme Court decided *Counterman*, and the government again opposed. 9-ER-1867-68; 1-SER-11. Again, the district court did not rule on the motion, instead terminating it after trial. 9-ER-1979.

Garg makes no effort now to explain how the district court abused its discretion in declining to rule on his untimely motions, nor why there

is good cause for this Court to review them in the first instance.[23] *See* AOB-70-72. Just as with Garg's untimely pro se suppression motion, the Court need go no further in analyzing this claim. But in any event, Garg's assertion that Count 8 of the indictment failed to allege an element of the crime fails on the merits.

Relying on *Counterman*, Garg argues that the indictment was defective because "it did not allege that [he] made any true threats of violence or that he acted with at least reckless disregard that [Ernsdorff] would regard his communications as true threats of violence." AOB-71. But, as explained above, a conviction for violating §2261A(2) does not require Garg to have threatened his victims. *See Osinger*, 753 F.3d at 944. That remains true after *Counterman*. *See Crawford*, 2025 WL 1248825, at *1; *Isho*, 2024 WL 135247, at *1. The indictment sufficiently alleged the necessary elements of cyberstalking under §2261A(2): i.e., that Garg, "with intent to harass and intimidate" Ernsdorff; used "facilities of interstate and foreign commerce" to "engage in a course of

---

[23] Garg did not claim in the district court that the *Counterman* decision constituted good cause to allow his untimely motions. *See* 9-ER-67-68. He cannot raise that issue for the first time on reply. *See Anekwu*, 695 F.3d at 985.

conduct that"; either placed Ernsdorff "in reasonable fear of death or serious bodily injury" to himself or "an immediate family member," or "caused, attempted to cause, or would be reasonably expected to cause, substantial emotional distress" to Ernsdorff, an immediately family member, his spouse, or his intimate partner. *See* 18 U.S.C. §2261A(2)(A) and (B); *see also* 1-ER-96-97. Nothing more was required, and the Court should reject Garg's challenge to Count 8 for the same reasons that doom his challenge to the jury instruction for cyberstalking.

## CONCLUSION

This Court should affirm Garg's convictions.

March 13, 2026

Respectfully submitted,

*s/ Tania M. Culbertson*
TANIA M. CULBERTSON
Assistant United States Attorney
Western District of Washington
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(205) 553-7970

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 24-5019 and 25-1702

I am the attorney or self-represented party.

**This brief contains** | 18,819 | **words,** including | 767 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Tania M. Culbertson | **Date** | March 13, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**      *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 24-5019 and 25-1702

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/ Tania M. Culbertson | **Date** | Mar 13, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**      *New 12/01/2018*