**Nos. 24-5019, 25-1702**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SUMIT GARG,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Western District of Washington, Seattle
D.C. No. 2:21-cr-00045-JCC-1

---

## Appellant's Redacted Reply Brief

## Redacted – Filed Publicly

---

DAVINA T. CHEN
LAW OFFICE OF DAVINA T. CHEN
1751 Colorado Blvd., No. 190
Los Angeles, California 90041
(213) 446-8791
Davina@DavinaChen.com

*Counsel for Defendant-Appellant*
SUMIT GARG

# Table of Contents

**Page(s)**

Table of Authorities.................................................................4

Reply ........................................................................................8

Argument..................................................................................9

I.     The government's Fourth Amendment arguments fail on every level..................................................................................9

     A.     The issue is not waived. .............................................9

     B.     The government's argument is untethered to law. ..............12

         1.     The balance has already been struck. .........................13

         2.     In any event, the police, not Garg, designed and executed the November 1 ruse......................................18

         3.     The government has no answer to the independent curtilage violation. ......................................................19

     C.     The government misapprehends the harmless-error standard and misstates the centrality of the phone evidence. .............................................................................20

         1.     The evidence on the phone was damning....................22

         2.     The government asked the jury to rely on the evidence on the phone to reach its verdict. .................25

II.     The government's Sixth Amendment arguments misapprehend the right to self-representation and the meaning of structural error. ..........................................................28

     A.     The record reflects that the district court's refusal to consider motions necessary to Garg's defense deprived him of actual control over his defense. .................................28

1.    The government successfully persuaded the court to bind Garg to counsel's decisions. .............................29

2.    The government conflates Rule 12 compliance with the right to self-representation. ..........................30

3.    The volume of Garg's filings underscores the violation, not its absence..............................................33

B.    The prison's refusal to permit Garg to confer with his expert compounded the court's errors. ...............................36

III.    The district court's clearly erroneous factual finding requires reversal of the plea-offer ruling. ..................................42

A.    The district court's finding is directly contradicted by the document it cites. ...........................................42

B.    The documentary record corroborates Garg, not Camiel. ..................................................................................44

C.    The government's "buyer's remorse" narrative misreads the record..............................................................45

IV.    Reversal is required for instructional error...................................48

D.    The jury instructions permitted conviction based on protected speech. ..............................................48

1.    The government does not argue that the instructions complied with *Counterman*. ....................49

2.    *Osinger* does not foreclose the claim...........................50

E.    The Counts 2-4 instructional error was preserved and prejudicial.........................................................53

V.    Count 8 must be dismissed. .........................................................54

Conclusion ...................................................................................57

# Table of Authorities

**Page(s)**

### Other Authorities

*Arnold v. Runnels*, 421 F.3d 859 (9th Cir. 2005)............................ 21, 22

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ......................... 13, 16

*Bruton v. United States*, 391 U.S. 123 (1968) ........................................23

*Chapman v. California*, 386 U.S. 18 (1967)............................................21

*Chess v. Dovey*, 790 F.3d 961 (9th Cir. 2015) ........................................53

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026) ........................................52, 53

*Counterman v. Colorado*, 600 U.S. 66 (2023) ........................................51

*Davis v. Mississippi*, 394 U.S. 721 (1969)...............................................28

*Fahy v. State of Conn.*, 375 U.S. 85 (1963) .............................................21

*Faretta v. California*, 422 U.S. 806 (1975)..............................................30

*Florida v. Jardines*, 569 U.S. 1 (2013)...................................................20

*Garcia v. Runnels*, 2004 WL 1465696 (N.D. Cal. 2004) ........................47

*Hayes v. Florida*, 470 U.S. 811 (1985) ...................................................28

*Houston v. Maricopa*, 116 F.4th 935 (9th Cir. 2024)............................49

*Ker v. California*, 374 U.S. 23 (1963)......................................................17

*Kirk v. Louisiana*, 536 U.S. 635 (2002)........................................ 13, 14, 20

*Kotteakos v. United States*, 328 U.S. 750 (1946)....................................21

*Lafler v. Cooper*, 566 U.S. 156 (2012) ....................................................47

*Lewis v. United States*, 385 U.S. 206 (1966)...........................................14

*Matsumoto v. Labrador*, 122 F.4th 787 (9th Cir. 2024) ................... 52, 53

*McKaskle v. Wiggins*, 465 U.S. 168 (1984) ........................... 28, 30, 32, 36

*McWilliams v. Dunn*, 582 U.S. 183 (2017) ............................................. 37

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ................................... 53

*Milton v. Morris*, 767 F.2d 1443 (9th Cir. 1985) ................................... 39

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................. 9, 30

*Payton v. New York*, 445 U.S. 573 (1980) .............................. 8, 12, 13, 17

*Pinkerton v. United States*, 328 U.S. 640 (1946) ................................. 25

*Riley v. California*, 573 U.S. 373 (2014) ......................................... 13, 17

*Sorrells v. United States*, 287 U.S. 435 (1932) ................................... 14

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................. 42

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ........................................ 54

*United States v. Alverez-Tejeda*, 491 F.3d 1013 (9th Cir. 2007) ....... 15, 18

*United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011) .............. 55

*United States v. Bernard*, 625 F.2d 854 (9th Cir. 1980) ........................ 23

*United States v. Bissell*, 504 F.3d 956 (9th Cir. 2007) .......................... 43

*United States v. Bosse*, 898 F.2d 113 (9th Cir. 1990) ........... 12, 15, 16, 17

*United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005) .......................... 49

*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015) .................. 56

*United States v. Dennis*, 132 F.4th 214 (2d Cir. 2025) ..................... 49, 55

*United States v. Engel*, 968 F.3d 1046 (9th Cir. 2020) .......................... 36

*United States v. Esqueda*, 88 F.4th 818 (9th Cir. 2023) ................... 12, 14

*United States v. Farias*, 618 F.3d 1049 (9th Cir. 2010)..........................31

*United States v. Flewitt*, 874 F.2d 669 (9th Cir. 1989)...........................30

*United States v. Gordon*, 156 F.3d 376 (2d Cir. 1998)...........................47

*United States v. Gust*, 405 F.3d 797 (9th Cir. 2005)..............................43

*United States v. Hansen*, 599 U.S. 762 (2023)................................52, 53

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009).......................43

*United States v. Job*, 871 F.3d 852 (9th Cir. 2017) ..........................25, 27

*United States v. Liquidators of European Federal Credit Bank*, 630 F.3d
     1139 (9th Cir. 2011) .....................................................................9, 10

*United States v. Little*, 753 F.2d 1420 (9th Cir. 1984)...........................12

*United States v. Lundin*, 817 F.3d 1151 (9th Cir. 2016) ..................19, 20

*United States v. Magdirila*, 962 F.3d 1152 (9th Cir. 2020)....................10

*United States v. Mancinas-Flores*, 588 F.3d 677 (9th Cir. 2009) ...........55

*United States v. Oaxaca*, 233 F.3d 1154 (9th Cir. 2000) .......................21

*United States v. Ortiz-Hernandez*, 427 F.3d 567 (9th Cir. 2005)...........28

*United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014).............. 50, 51, 56

*United States v. Parga-Rosas*, 238 F.3d 1209 (9th Cir. 2001)................28

*United States v. Phillips*, 497 F.2d 1131 (9th Cir. 1974)..................12, 15

*United States v. Qazi*, 975 F.3d 989 (9th Cir. 2020)..............................55

*United States v. Ramirez*, 976 F.3d 946 (9th Cir. 2020)....... 12, 14, 18, 20

*United States v. Rice*, 776 F.3d 1021 (9th Cir. 2015)........................32, 33

*United States v. Rodriguez*, 880 F.3d 1151 (9th Cir. 2018)....................48

*United States v. Sarno*, 73 F.3d 1470 (9th Cir. 1995)............................39

6

*United States v. Sryniawski*, 48 F.4th 583 (8th Cir. 2022) ..............50, 52

*United States v. Stoterau*, 524 F.3d 988 (9th Cir. 2008) ........................25

*United States v. Woodberry*, 987 F.3d 1231 (9th Cir. 2021) ...................48

*Whalen v. McMullen*, 907 F.3d 1139 (9th Cir. 2018)............ 12, 14, 15, 17

## Statutes

18 U.S.C. § 2261A................................................................. 49, 52, 53

18 U.S.C. § 2266(2) .......................................................................53

## Rules

9th Cir. R. 36-3 .............................................................................52

Fed. R. App. P. 28(a)(8)(A) ............................................................25

**Reply**

This should be a straightforward appeal.

Seattle police arrested Sumit Garg inside his home, without a warrant, after misrepresenting their purpose to gain entry. That misrepresentation rendered the entry non-consensual and the arrest a violation of *Payton v. New York*'s categorical prohibition on warrantless in-home arrests. The phone seized incident to that unlawful arrest became the centerpiece of the government's case—which the government described, before trial, as containing some of the most damning evidence against Garg. It asked the jury to rely on that evidence in opening, closing, and rebuttal. Suppression was required. Reversal follows from that error alone.

The other errors are equally clear. The district court told Garg—in writing, repeatedly—that it would not consider any motion his prior counsel could have filed. That is a Sixth Amendment violation. Garg's lawyer's letter, written to create a record of his advice, does not say what the district court found it said. That is clear error.

The government's brief works hard to make each of these questions seem close. They are not. The government accuses Garg of misstating the record. Garg asks the Court to read it. It requires reversal.

8

### Argument

**I.    The government's Fourth Amendment arguments fail on every level.**

####     **A.    The issue is not waived.**

The government devotes the first half of its Fourth Amendment analysis to arguing that Garg's suppression claim was waived under Rule 12. (Answer 48-51[1]). But the government itself foreclosed that argument below. In opposing Garg's motion to reopen, the government told the district court that "Mr. Camiel *did* challenge the validity [of] Garg's arrest, and argued that the officers' entry into Garg's house could not be justified as consensual because it was based on a misrepresentation." (4-ER-745) (emphasis added). The district court relied on this representation in denying Garg's motion to reopen. (1-ER-68; *see also* FER-211-12; 1-ER-103-04).

Having persuaded the district court that the *Payton* issue was already litigated—and thus Garg need not be permitted to relitigate it—the government cannot now reverse course and argue the issue was never raised. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *accord United States v. Liquidators of European Federal Credit Bank*, 630 F.3d

---

[1] Answer is the Government's Answering Brief; AOB is Appellant's Opening Brief. ER is Appellant's Excerpts of Record; SER is Appellee's Supplemental Excerpts of Record; FER is Appellant's Further Excerpts of Record. Dx is Defendant's Trial Exhibit which, if documentary, is included in the ER.  Dx 68, 78, and 79 are audio recordings, which can be provided at the Court's request.

9

1139, 1148-49 (9th Cir. 2011). The government does not even respond to this judicial estoppel argument, which alone justifies reaching the merits.

The government's footnote 8 illustrates the inconsistency. The footnote concedes that the government's prior representation to the district court—that Camiel "did challenge the validity [of] Garg's arrest"—was "imprecise." (Answer 48 n.8). Having acknowledged that Camiel did not in fact raise a *Payton* challenge, the footnote nonetheless asserts that the district court's denial of Camiel's non-*Payton* motion "confirms that any challenge based on *Payton* would lack merit." (*Id.*). But the district court stated that "[n]either party disputes the fact that Defendant's arrest was a lawful probable cause arrest." (1-ER-16). A court's silence on a question it was never asked cannot "confirm" anything about that question's merits. [2] The government cannot have it both ways: Either Camiel raised the *Payton* issue (in which case it was preserved and the district court's denial is subject to review here), or he did not (in which case the government's earlier representation to the

---

[2] If, as the government appears to suggest (Answer 48 & n.8), the district court effectively decided the ruse issue because Camiel described the relevant facts in his brief and the court denied the motion, then the issue was preserved. *United States v. Magdirila*, 962 F.3d 1152, 1156-57 (9th Cir. 2020).

contrary, which led the district court to deny the renewed motion, cannot now be retracted).

Good cause exists to reach the issue under Rule 12(c)(3). Garg raised the *Payton* issue—with extensive citations—within two days of the suppression motion's denial (11-ExParteER-2196-97); explained that he had shared his research with his attorney, who had refused to raise the issue; persisted in trying to get the court to address it for over a year; and even attempted to raise the issue at trial when the witnesses who conducted the warrantless in-home arrest testified. The government cites no authority that a pro se defendant who acts with such diligence, stymied by obstacles beyond his control, lacks good cause.

Finally, at Issue II, the government argues, without irony, that the district court's categorical refusal to consider any of Garg's motions that his attorney *could* have filed but did not file—even if that failure was based on a difference in defense strategy—did not deprive Garg of his Sixth Amendment right to control his own defense. (Answer 66-82). The government complains that "Garg has not explained how the court's rulings prevented him from advancing any of his theories of defense." (Answer 67). As argued there, Sixth Amendment violations are structural for the very reason that it is often impossible to know the effect of the error. But in this case, one effect of the error is eminently knowable: the government's ability to block serious consideration of

11

Garg's Fourth Amendment issues. Whether because the issues were presented, the government is estopped, the court effectively decided them, Garg's diligence establishes good cause, or the Sixth Amendment violation requires it, this Court can and should reach this claim.

### B. The government's argument is untethered to law.

On the merits, the government avoids stating—even once—*Payton*'s categorical rule that "the Fourth Amendment to the United States Constitution ... prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576 (1980).

The arrest here violated this "unequivocal" rule. *Id.* at 602. It was a routine felony arrest. In Garg's home. Warrantless. And this Court has held consistently for decades that a "ruse entry"— "when the suspect is informed that the person seeking entry is a government agent but is misinformed as to the purpose for which the agent seeks entry"— "cannot be justified by consent." *Whalen v. McMullen*, 907 F.3d 1139, 1147 (9th Cir. 2018) (cleaned up); *see also United States v. Ramirez*, 976 F.3d 946 (9th Cir. 2020); *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990); *United States v. Phillips*, 497 F.2d 1131, 1135 n.4 (9th Cir. 1974); a*ccord United States v. Esqueda*, 88 F.4th 818, 826 n.4 (9th Cir. 2023); *United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984). That is this case. A warrant was required.

### 1. The balance has already been struck.

The government proposes, instead, that every warrantless entry into a private home to make a routine felony arrest is subject to an individualized, case-by-case balancing test, apparently to be performed by the officers on the scene—or, as here, by the detective who designed the ruse. (Answer 40, 51-55). That is not the law.

"If police are to have workable rules, the balancing of the competing interests must in large part be done on a categorical basis—not in an ad hoc, case-by-case fashion by individual police officers." *Riley v. California*, 573 U.S. 373, 398 (2014) (cleaned up). "[A] responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001).

Here, the balance the government suggests Detective Kang and her officers were striking on the fly had already been struck for decades. In *Payton*, the Supreme Court addressed the parties' arguments about the practical consequences of a warrant requirement for a felony home arrest. 445 U.S. at 602. It viewed such "arguments of policy" with skepticism and held, "fundamentally," they "must give way to a constitutional command that we consider to be unequivocal." *Id.* The Supreme Court reasserted in *Kirk v. Louisiana,* 536 U.S. 635 (2002),

13

that "[a]bsent exigent circumstances, the firm line at the entrance to the house may not reasonably be crossed without a warrant." *Id.* at 636 (cleaned up).

The government opens its merits discussion arguing that law enforcement "'may use deceit in certain circumstances.'" (Answer 51) (quoting *Ramirez*, 976 F.3d at 952). That is correct—and irrelevant. In determining when deception may be used without vitiating consent to an intrusion into one's home, this Court has drawn a bright line "between 'undercover' entries, where a person invites a government agent who is concealing that he is a government agent into her home, and 'ruse' entries, where a known government agent misrepresents his purpose in seeking entry." *Whalen*, 907 F.3d at 1147. "The former does not violate the Fourth Amendment, as long as the undercover agent does not exceed the scope of his invitation while inside the home." *Id.* (citing *Lewis v. United States*, 385 U.S. 206, 211 (1966)); *accord Esqueda*, 88 F.4th at 826 n.4. But a ruse entry when a known government agent misrepresents his purpose does. *Whalen*, 907 F.3d at 1147.

*Ramirez* itself *found a Fourth Amendment violation*, precisely because the deception there crossed the line that distinguishes permissible undercover work from impermissible ruse-based intrusion. 976 F.3d at 953-54. The government's reliance on *Lewis* and *Sorrells v. United States*, 287 U.S. 435 (1932) (Answer 51-52), is misplaced for the

same reason: both involve undercover operations—not ruse entries by known officers—and this Court has consistently distinguished *Lewis*-style undercover entries from *Whalen*-style ruse entries on exactly that ground. *Whalen*, 907 F.3d at 1147; *Bosse*, 898 F.2d at 115; *Phillips*, 497 F.2d at 1135 n.4. The government's reliance on *United States v. Alverez-Tejeda*, 491 F.3d 1013 (9th Cir. 2007) (Answer 52) fails for a related reason: There, officers used deception to seize a car the government had constitutional authority to seize without a warrant; here, they used deception to enter a home the government had no authority to enter without one. *Id.* at 1016.

The government argues that the values underlying this Court's ruse-entry rule—protecting a private individual's trust in government and promoting civic cooperation with law enforcement—were not implicated here because Garg was manipulating, not honestly assisting, law enforcement. (Answer 52-55). But this Court has never made the predicted impact of the officer's lie part of the rule. *Whalen*, 907 F.3d at 1147; *Bosse*, 898 F.2d at 115-16. And for good reason. How are officers to determine, *ex ante*, how lying to gain entry will damage trust in law enforcement in a particular case? In this very case, Ms. Hefton can be heard on the officer's bodycam asking why the officers misrepresented their purpose. (Dkt. 51). The impossibility of making such a determination is exactly why the Court favors categorical rules. "[T]he object in implementing [the Fourth Amendment's] command of

15

reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made." *Atwater*, 532 U.S. at 346-47. The government's rule is full of "those 'ifs, ands, and buts' rules, generally thought inappropriate in working out our Fourth Amendment protections." *Id.* at 350 (cleaned up).

And, although the government complains that Garg's conduct needed to be stopped, *Payton* and *Whalen* do not prohibit arrest; they require a warrant.

Attempting to avoid the categorical rule set down in this Court's ruse cases, the government suggests that those cases forbid only "fabricat[ing] a ruse out of whole cloth." (Answer 54). This suggestion is directly refuted by *Bosse*, where the defendant initiated a regulatory process that brought officers to his door: he applied for a firearms license that triggered a state inspection, and an ATF agent accompanied the state inspector under the guise of assisting with the license inspection while actually investigating federal firearm violations. 898 F.2d at 114-15. Bosse's application initiated the state inspection, and the ATF agent "played along" so he could perform a warrantless search. The Court found the entry violated the Fourth Amendment. The unconstitutionality, the Court explained, arose from the misrepresentation by a known government agent of his purpose for seeking entry. *Id.* at 115-16. The fact that the agent was merely

accompanying state officers who were there for legitimate purposes was irrelevant.

The government's contention that Detective Kang's suspicions concerning Garg justified lying to gain entry has no foothold in Fourth Amendment doctrine. The Fourth Amendment "protects all, those suspected or known as to be offenders as well as the innocent." *Ker v. California*, 374 U.S. 23, 33 (1963). That it turned out that Whalen had applied for disability benefits to which she was not entitled, *Whalen*, 907 F.3d at 1145, and Bosse a firearms license despite committing federal firearms violations, *Bosse*, 898 F.2d at 115, did not permit the government to lie to get into their homes. Whether Garg was "already manipulating law enforcement" (Answer 54) was a question for the jury at his trial, not a justification for dispensing with the warrant requirement. Although that requirement "impact[s] the ability of law enforcement to combat crime," it "is an important working part of our machinery of government, not merely an inconvenience to be somehow weighed against the claims of police efficiency." *Riley*, 573 U.S. at 401 (cleaned up).

"[T]he overriding respect for the sanctity of the home ... has been embedded in our traditions since the origins of the Republic." *Payton*, 445 U.S. at 601. "A suspect's Fourth Amendment interests are at their zenith where, like here, government officials lie in order to gain access to [places and] things they would otherwise have no legal authority to

17

reach." *Ramirez*, 976 F.3d at 957 (quoting *Alverez-Tejeda*, 491 F.3d at 1017). That is this case. Detective Kang directed the officers to make a "probable cause arrest" without obtaining a warrant. (2-ER-167). Officers had no legal authority to enter Garg's home. They acquired consent by lying. That is the "zenith" of the constitutional concern. *Id.* The proper response to a deceitful suspect is a warrant, not law enforcement deception.

> **2.** **In any event, the police, not Garg, designed and executed the November 1 ruse.**

Even if the ruse-entry inquiry were a balancing test that tipped against Garg if he instigated the deception—and, as just shown, it is not—the government's premise that Garg did so is factually wrong. The ruse that brought officers into Garg's home on November 1 was not Garg's; it was Detective Kang's. The record is unambiguous. Detective Kang decided on November 1 to make a "probable-cause arrest," asked Seattle Police Department's Community Response Group to effectuate the arrest (and to seize any digital devices), and designed the stratagem of using Officer Oliverson to gain entry: Her "idea was to use Mr. Oliverson to get [Garg] to open the door in order to arrest [him]" that night. (4-ER-823-24). Officer Daily then called Garg and Hefton, misrepresenting that he was coming to their home to follow up on their report of an intruder—a misrepresentation made for the express

18

purpose of gaining entry to effect a warrantless arrest. (3-ER-522; 4-ER-813-15).

The government repeatedly characterizes this as officers "play[ing] along with [Garg's] fraud." (Answer 53-55). That characterization elides the operative deception. Whatever Garg may have falsely reported, the deception that procured entry on November 1 was Officer Daily's false statement of the officers' purpose for coming to the home. What matters under the categorical rule is known officers' misrepresentation of their purpose for entering a private home—and that misrepresentation was made by Officer Daily, at Detective Kang's direction, for the express purpose of effecting a warrantless arrest.

### 3. The government has no answer to the independent curtilage violation.

Finally, even setting aside the ruse entry, the warrantless arrest independently violated the Fourth Amendment on a ground the government does not address: Officers entered the curtilage of Garg's home with the intent to arrest. (AOB 25-26). "The 'knock and talk' exception to the warrant requirement does not apply when officers encroach upon the curtilage of a home with the intent to arrest the occupant." *United States v. Lundin*, 817 F.3d 1151, 1160 (9th Cir. 2016). Detective Kang's plan, as she testified, was to send officers to Garg's door for the purpose of effecting an arrest. (4-ER-823-24). That intent

19

stripped the officers' intrusion onto the porch and driveway of any "knock and talk" justification.

The government's Answer does not cite *Florida v. Jardines*, 569 U.S. 1, 8 (2013), or *Lundin*; does not contest that officers entered the curtilage with intent to arrest; and does not identify any applicable justification. The point is therefore waived. *Ramirez*, 976 F.3d at 955 n.3. It is dispositive on its own: Even if officers had not used a ruse, the warrantless curtilage intrusion with intent to arrest would itself require suppression of all evidence flowing from the intrusion. *Lundin*, 817 F.3d at 1160.

*Payton* establishes a categorical rule, not a balancing test. The officers' deliberate, premeditated misrepresentation to gain entry to a private home to perform a warrantless arrest violates that rule. The curtilage violation is independently dispositive. Garg's arrest violated the Fourth Amendment, and the phone was a fruit of that arrest. *Kirk,* 536 U.S. at 638.

### C. The government misapprehends the harmless-error standard and misstates the centrality of the phone evidence.

Despite its own characterization of the phone evidence as "some of the most damning evidence in the case" (3-ER-544; Answer 59 n.10), the government now argues that any error in failing to suppress that evidence was harmless beyond a reasonable doubt. (Answer 55-66). It

was not. For constitutional error, the "question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 23 (1967) (quoting *Fahy v. State of Conn.*, 375 U.S. 85, 86-87 (1963)). "[A]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless." *Chapman*, 386 U.S. at 23-24.

The government simply cannot establish, much less beyond a reasonable doubt, that the Pixel 3a evidence did not influence the jury. It has not even tried. It argues only that the remaining evidence was sufficient to convict: "[T]his brief's statement of facts cites *only* the trial evidence derived independently from Garg's phone, and yet it shows beyond any reasonable doubt that Garg committed the offenses." (Answer 58); "The full record shows that material from Garg's phone corroborated other evidence in the case but that excising it would not have changed the result." (Answer 60). But "[t]here is a striking difference between appellate review to determine whether an error affected a judgment and the usual appellate review to determine whether there is substantial evidence to support a judgment." *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000) (cleaned up).[3]

---

[3] Even under the less stringent *Kotteakos v. United States*, 328 U.S. 750 (1946), standard, error is not harmless merely because "the evidence of guilt was compelling," or even because the government "presented devastating evidence." *Arnold v. Runnels*, 421 F.3d 859, 868-

21

### 1. The evidence on the phone was damning.

Given the "damning evidence" on the phone, the government cannot show it did not influence the jury. This is the evidence that tied an otherwise anonymous, multi-account stalking campaign to Garg personally. The government's witnesses testified at trial about the following evidence found on the Pixel 3a:

- The primary email accounts used to harass the victims (5-SER-1186-87)

- WhatsApp messages the government argued showed Garg directing the campaign (5-SER-1188-90, 1190-92)

- A screen-shot the prosecutor later called "a freeze-frame capturing a stalker" (5-SER-1193-95; 6-SER-1436)

- Hushed burner-app artifacts linking the number used to send the harassing texts to Garg's phone. (5-SER-1197-1200)

- Xfinity Wi-Fi cookies and logs the government argued placed the phone at the Tower 12 apartment building on October 10, 2020 (5-SER-1201-1204)

- EXIF metadata identifying the Pixel 3a as the camera that took the Tower 12 lobby photographs emailed to the victim (5-SER-1204-1207)

- Digital Wellbeing logs showing the camera app was opened seconds before the stalking photos were taken—which the witness synchronized, second by second, with the building's

---

69 (9th Cir. 2005). The question is not "whether the jury would have decided the same way even in the absence of the error." *Id.* at 869. "The question is whether the error influenced the jury." *Id.*

surveillance video to place the camera in Garg's hand. (5-SER-1207-1216)

- Ring doorbell "blooper reels" recovered from the phone's cache showing the staging of the October 31 burglary (5-SER-1236; 6-SER-1431, 1444)

This was the forensic backbone of the government's case. The government now dismisses all of it as merely "corroborative" (Answer 60-62), but corroborative evidence is not the same as superfluous evidence.

The phone's reach, moreover, extends past the items the government concedes came from it. For example, among the proofs the government marshals to show that Garg took the lobby photographs is "Garg's admission at trial that he was in the lobby." (Answer 61). But that admission was itself the fruit of the unlawful phone seizure. The government cannot use the phone to produce the stipulation and then offer the stipulation as independent evidence.

Stripped of the phone evidence, the government's case against Garg rested almost entirely on the testimony of Lindsay Hefton—an unindicted accomplice who participated in the very crimes she described. (Answer 57-58, 60-62) (recounting Hefton testimony). Generally, "[a]ccomplice testimony is 'inevitably suspect' and unreliable." *United States v. Bernard*, 625 F.2d 854, 857 (9th Cir. 1980) (quoting *Bruton v. United States*, 391 U.S. 123, 136 (1968)). Here, it was especially suspect. Hefton herself told Garg, in a recorded jail call, that

cooperation meant coming to court and lying for the government that Garg was guilty. (4-SER-926-27; Dx 68). She was impeached by additional phone calls and letters as well as her testimony in earlier proceedings. (4-SER-958-962; FER-170-79; Dx 78, 79).

The prosecutors themselves had described Hefton as "a person who has demonstrated a history of deceit and dishonesty." (6-SER-1326-27). It was Hefton, not Garg, who had the computer expertise to effectuate the cyberstalking campaign. (4-SER-779, 784, 786-88, 912-913, 915-916, 977-78). In the months leading to Garg's trial, she falsely reported to the superior court, the federal prosecutor, and the case agent that, while in custody, Garg (whom she claimed was bank-rolled by the brother and father of a separate ex-boyfriend) was stalking her by hiring people to surveil and intimidate her. (4-SER-946-54, 962; FER-163, 164, 183-88, 189-90). She also reported Garg's paralegal for possibly stalking her, including suggesting that she might be "Iryna Romero, who speaks Russian and Ukranian." (4-SER-962-64; FER-180-82).

The case agent testified that she visited Hefton, and that Hefton accused Garg of contacting outside entities from custody and directing a remote stalking campaign against her—but she did not conduct Hefton's requested search for surveillance equipment in her home or take any other protective measures. (5-SER-1289-1291). Later, Hefton

24

sent the agent a letter reasserting the accusations. (5-SER-1291; FER-164).

The phone evidence provided the independent forensic corroboration that transformed an inherently unreliable accomplice's impeached account into convincing proof.[4]

> **2. The government asked the jury to rely on the evidence on the phone to reach its verdict.**

The Pixel 3a evidence also "might have contributed to the conviction" because the government asked the jury to rely on it—in its opening, closing, and rebuttal. *See, e.g., United States v. Job*, 871 F.3d 852, 866 (9th Cir. 2017) (holding failure to suppress evidence not harmless, despite substantial evidence, where prosecutor mentioned it three separate times in closing argument). By complaining that Garg overstates the focus the phone received at trial (Answer 59 & n.11),[5] the

---

[4] The government argues in a single sentence that, even if Hefton—and not Garg—had committed the crimes, this would have no bearing on Garg's convictions "because the jury was correctly instructed under a *Pinkerton* theory of liability." (Answer 62). The government has waived the *Pinkerton* issue by failing to develop it. *United States v. Stoterau*, 524 F.3d 988, 1003 n.7 (9th Cir. 2008); Fed. R. App. P. 28(a)(8)(A). And even if not waived, a conviction under *Pinkerton v. United States*, 328 U.S. 640 (1946) would have required the government to prove Garg conspired with Hefton, which depended on the same inadmissible Pixel 3a evidence.

[5] The pages the government characterizes as "redacted" (Answer 59 n.11) are excerpts of the prosecutor's arguments, reproduced as excerpts so the Court can locate the specific passages cited. The full transcript was always part of the district court record and is now

government implicitly concedes that the attention a piece of evidence received bears on harmlessness. Garg's Opening Brief *understated* the focus the Pixel 3a received at trial:

The government opened on the Pixel 3a, discussing it four times over six pages of a fourteen-page opening. (1-SER-66 lines 7-19, 1-SER-67 line 5-68 line 11, 1-SER-69 lines 13-19, 1-SER-71 line 12-72 line 6). Nearly half its opening statement was about the Pixel 3a.

It closed on the phone, arguing that just "some of the evidence from the phone" was "evidence that proves beyond any doubt that Mr. Garg is the person stalking on that evening," explaining that "there was other evidence on the phone," and then going on to describe that evidence as "a freeze-frame capturing a stalker." (6-SER-1436). Indeed, it returned repeatedly to how evidence derived from the Pixel 3a proved Garg was the stalker:

- the WhatsApp messages (6-SER-1428-29)

- the blooper videos (6-SER-1431)

- the Tower 12 timeline establishing "beyond any doubt" that Garg was stalking (6-SER-1433-36)

- the text message with the screen-shot attachment (6-SER-1436-37)

---

reproduced in the government's supplemental excerpts at 1-SER-59-73; 6-SER-1421-56, 1494-98. That fuller record contains more, not fewer, examples of the prosecutor's reliance on the Pixel 3a evidence.

- more on the blooper videos (6-SER-1444-45)

- more WhatsApp messages (6-SER-1449, 1451)

In responding to Garg's arguments, the government emphasized "all the other evidence that tells you that's the phone that did the stalking, that's the phone that took the pictures, that's Mr. Garg's phone" (6-SER-1453-54).

The government returned to the phone in its final rebuttal. It argued, again, that the Tower 12 photos could not have been modified to make it appear they were coming from the Pixel 3a (6-SER-1494). And, in its closing salvo, the government referred again to "the evidence off Mr. Garg's phone, it all points to Mr. Garg." (6-SER-1498).

Here, as in *Job*, given the "likelihood that the jury considered the evidence explicitly mentioned several times in closing," 871 F.3d at 867, it cannot be seriously disputed that evidence from the Pixel 3a "might have contributed to the conviction." In the government's own words to the jury, this was "the phone that did the stalking." (6-SER-1453-54). Having staked its case on that evidence at trial, the government cannot now argue the same evidence could not have affected the verdict. It certainly cannot be discounted beyond a reasonable doubt. Reversal is required on this issue alone.[6]

_____

[6]As argued in Garg's Opening Brief, on remand the district court should review the admissibility of the remaining evidence presented at trial, to which the government never responded. (AOB 31-32).

27

## II. The government's Sixth Amendment arguments misapprehend the right to self-representation and the meaning of structural error.

Garg was nominally pro se, but bound to his prior counsel's motions and strategic decisions, denied discovery his counsel chose not to seek, and denied expert access. He was merely a passenger in prior counsel's vehicle. It cannot be said that Garg had "actual control over the presentation of his own defense at all times," which is what the Sixth Amendment requires. *McKaskle v. Wiggins*, 465 U.S. 168, 186 (1984). The government misapprehends both the substance of this right and the meaning of structural error.

### A. The record reflects that the district court's refusal to consider motions necessary to Garg's defense deprived him of actual control over his defense.

It was the government that first proposed the "second bite at the apple" metaphor (5-ER-1021)—catchy, but with no foothold in the Sixth

---

The government's argument—presented to this Court either tardily or prematurely—that Garg's fingerprints were not suppressible even though they were obtained pursuant to an unconstitutional arrest is simply wrong. *Davis v. Mississippi*, 394 U.S. 721 (1969), *Hayes v. Florida*, 470 U.S. 811, 814-15 (1985), and *United States v. Ortiz-Hernandez*, 427 F.3d 567, 577 (9th Cir. 2005), all suppressed fingerprints obtained pursuant to an unconstitutional seizure. Garg's seizure, too, was unconstitutional. As for *United States v. Parga-Rosas*, 238 F.3d 1209 (9th Cir. 2001), the fingerprints taken at Parga-Rosas's unconstitutional arrest *were* suppressed; the fingerprints at issue on appeal were those lawfully taken four months later and, unlike here, were taken for the sole purpose of establishing identity. *Id.* at 1211-1212, 1215.

28

Amendment. The government then encouraged the district court to apply it repeatedly. Now it argues the court did no such thing.

### 1. The government successfully persuaded the court to bind Garg to counsel's decisions.

What the government did specifically with Garg's Fourth Amendment claims—represent to the district court that Camiel had raised the *Payton* issue and then argue to this Court that the *Payton* issue was waived—it does again here, writ large. The government successfully convinced the district court that "Garg should be bound by his counsel's decision as to which motions to file, and which not to file." (5-ER-1021). For example:

- In ECF 240, Garg filed a motion to compel discovery (second) regarding the technology the government used to perform its digital investigation ("technical information") (5-ER-1150-59);

- In ECF 241, the court struck ECF 240, among other motions, because Garg had not first filed a motion explaining why he had good cause to file the untimely discovery motion (1-ER-27);

- In ECF 243, in a pleading post-marked December 30, 2022, four days before the court struck ECF 240, Garg explained he had good cause to seek the technical information sought in ECF 240 because prior counsel's different trial strategy led him not to seek it (5-ER-1165-66, 1168);

- In ECF 251, the government argued that a different trial defense was insufficient to make out good cause to seek the

discovery of technical information requested in ECF 240 (5-ER-1171-72);

- In ECF 342, the court acknowledged that prior counsel had a different trial strategy but held that this was not sufficient to make out good cause to file the motion to compel discovery of the technical information because "this information was all available prior to the motions deadline." (1-ER-44-45).

Having successfully urged the court to bind Garg to prior counsel's decisions, the government should not now be heard to argue (Answer 68) that no such thing occurred. *New Hampshire*, 532 U.S. at 750.

### 2. The government conflates Rule 12 compliance with the right to self-representation.

The government frames the Sixth Amendment issue as a dispute about Rule 12 timeliness, arguing that Garg was simply held to the same rules as any litigant. (Answer 66-76). This misses the point. Under *Faretta v. California*, 422 U.S. 806 (1975), the right to self-representation includes the right to "control the organization and content of his own defense, to make motions, [and] to argue points of law." *McKaskle*, 465 U.S. at 174. A rule that prohibits a defendant from making motions his counsel chose not to make denies him that right. The question is, thus, not whether courts may enforce the same procedural deadlines against pro ses as they do for counsel—they may[7]—but whether a court may categorically prohibit a pro se

---

[7] The government's reliance on *United States v. Flewitt*, 874 F.2d 669 (9th Cir. 1989), for the proposition that pro se defendants must

defendant from filing any motion his prior counsel could have filed, effectively binding him to counsel's strategic choices. That, the court may not do.

But that is what happened here. The district court held that Garg's disagreement with prior counsel's strategy did not provide good cause to file pretrial motions, reasoning that Garg's "right to proceed pro se does not also entitle him to a second bite at the apple." (1-ER-43). The court then applied that rule to motion after motion. This was not a case-by-case assessment of timeliness; it was a categorical rule that imputed Camiel's strategic choices to Garg. The court's procedural framework was a closed loop. Pretrial motions were forbidden absent good cause. Good cause required new discovery the prosecution had not produced before the deadline. Discovery requests were denied because their only purpose, in the government's telling, was to support pretrial motions. (1-ER-33, 34, 44-45, 56). Garg could file a substantive motion

---

follow procedural rules (Answer 50, 66) is inapposite. *Flewitt* involved a defendant who sought special procedural advantages. Garg sought only what the court had already granted incoming appointed counsel: time to prepare his own defense. The court continued trial twice—totaling approximately eight months—so new counsel could "effectively investigate the case and prepare for trial." (5-ER-955, 957). But it denied Garg the ability to prepare, treating Camiel's work as Garg's own. *Farias* squarely holds that "[a] pro se defendant's opportunity to prepare cannot be conflated with prior counsel's preparation." *United States v. Farias*, 618 F.3d 1049, 1054 n.4 (9th Cir. 2010).

only on materials obtainable only by filing a motion he was forbidden to file.

This Court's decision in *United States v. Rice*, 776 F.3d 1021 (9th Cir. 2015), forecloses the "second bite" framing. In *Rice*, the district court delayed conducting a *Faretta* hearing for more than four months and, in the interim, "struck a dozen pretrial motions because they were not filed by counsel." 776 F.3d at 1025. This Court found no Sixth Amendment violation, but only because of what the district court did when it granted the *Faretta* motion: it "invited [the defendant] to refile all motions and extended the time to file motions to a date to which Rice stipulated, some three months away." *Id.* The result, this Court emphasized, was that "Rice thus had more time to prepare for trial than if his motion had been granted at the original" appearance. *Id.* at 1025-26. In short, the district court "reset the game clock," "placing Rice in the same situation as would have obtained had the magistrate judge granted the *Faretta* motion at the [first] appearance." *Id.* at 1026. That outcome, *Rice* held, satisfied what the Sixth Amendment requires: "a fair chance to present his case in his own way." *Id.* (quoting *McKaskle*, 465 U.S. at 177).

The district court here did the opposite. It granted Garg's *Faretta* motion eight months before trial (roughly the same window as in *Rice*, 776 F.3d at 1025-26) but refused to reset the clock. Where *Rice*'s district court invited the defendant to refile all motions, the court here required

32

Garg to show good cause for any motion prior counsel could have filed, then categorically held that disagreement with prior counsel's strategy was not good cause. (1-ER-39, 51, 53, 56-57). Where *Rice*'s district court extended the deadline by stipulation, the court here held Garg to a deadline that had passed while he was represented. The result was the inverse of *Rice*: rather than placing Garg in "the same situation as would have obtained had the [*Faretta*] motion [been granted]" earlier, *Rice*, 776 F.3d at 1026, the court placed him in a worse one—forced to defend himself with a defense developed by counsel whose strategy he had repudiated. *Rice* is not a footnote *cf.* (Answer 72 n.16). It is the constitutional baseline the district court refused to honor.

### 3. The volume of Garg's filings underscores the violation, not its absence.

The government emphasizes that Garg filed prolifically, averaging 42 docket entries per month. (Answer 38). But this argument confuses activity with efficacy. Many of Garg's filings were about the court's procedural restrictions—motions for leave, motions to show good cause, motions for reconsideration of denied motions for leave—precisely the "Kafkaesque cycle of litigation about litigation" his opening brief described. The one-motion-per-week rule compounded this problem, forcing Garg to choose between filing a motion for leave (as the court's procedure required) and filing a substantive defense motion.

33

The government does not engage with this catch-22. It points to motions the court did entertain, but the Sixth Amendment is not satisfied by the occasional nod to, for example, the need for stamps. Many of the motions Garg's defense required—motions reflecting his strategy rather than Camiel's—were struck, foreclosed, or ignored:

- The court took up the *government's* motion in limine to exclude any defense computer expert (1-ER-81), but did not address Garg's in limine motions—filed on May 25, 2023 (FER-9), May 30, 2023 (FER-22), and July 3, 2023 (FER-107).

- These included a *Daubert* motion directed at the government's computer experts. (FER-22-58).

- Garg moved to reinstate his motion to dismiss Count 8, the basis for Issue V in this appeal. (9-ER-1867-68).

- He filed a motion to dismiss for *Brady* violations. (FER-123).

- During trial, Garg filed additional motions on evidentiary issues, which the government responded to, but the court ignored. (FER-127).

Because the court had not ruled on any of these motions pretrial, and would not permit Garg to inquire about them during trial, Garg filed a motion requesting that the court rule on them. (9-ER-1905-06). The court did not—instead, terminating them all post-trial without ruling. (1-ER-97).

Consider the *Daubert* motion: Garg moved to conduct a *Daubert* hearing and to preclude the government's experts from giving opinions

34

on topics of which they had no expertise and that were not based on any reliable methodology. (FER-22-58, 59-106, 149-50). The government argued that any deficiencies in its witnesses' expertise or methodology should be "tested by the adversary process—competing expert testimony and active cross-examination." (6-ER-1221).

The court did not take up Garg's motion. At trial, after the government's witness opined that it was possible to create an email account on a phone without leaving any evidence, Garg requested that the witness demonstrate, since "I don't have my own expert" to explain that's not possible. The court sustained the government's objection. (5-ER-1242-43). After the government asked its witness to opine whether certain emails were scheduled to be sent at a later time than they were created, Garg again objected that his *Daubert* motion had yet to be ruled upon. The court overruled the objection without any inquiry. (6-SER-1217). Then, when Garg attempted to examine the expert on whether the success rate of his methodology was only 5.6%, the witness disclaimed knowledge of that data, and the cross-examination was prohibited. (6-SER-1256-58).

The question on appeal is not whether Garg would have prevailed on his *Daubert* motion. The question is whether it was permissible, consistent with Garg's Sixth Amendment right to self-representation, for the court to bypass its gatekeeping role, refuse to voir dire the

35

witness, permit expert opinions without any showing of reliability, and then prevent Garg from testing them on cross. It was not.

### B. The prison's refusal to permit Garg to confer with his expert compounded the court's errors.

The government feigns ignorance of "why" Garg describes the events surrounding his attempts to secure a computer expert. (Answer 71). But the government cannot dispute that there was no way to prepare to defend—much less defend—this case without a computer expert. (AOB 48-49). Instead, the government argues that Garg has not carried his purported "burden" of showing how the court's rulings prevented him from meaningfully defending himself. (Answer 72 & n.16). This argument fails for at least five reasons.

First, Garg has no burden to show prejudice. "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to harmless error analysis." *McKaskle*, 465 U.S. at 177 n.8. *Faretta* violations are structural *because* their effects on the outcome are unknowable. *United States v. Engel*, 968 F.3d 1046, 1052 (9th Cir. 2020). Although the government disclaims harmless-error analysis in a footnote (Answer 72 n.16), it builds its argument on the demand that Garg show specific prejudice. That demand is harmless-error review by another name.

36

Second, the government's emphasis on the fact that the court ultimately authorized some expert funding (Answer 71, 77) is beside the point. What was required was access to a defense expert, not authorization on paper. From June 2023, when the court approved funds, until February 2024, Garg could not speak with the expert he had retained. (6-ER-1273, 1283-87, 1305, 1314). When the court finally ordered BOP to permit a call within 7 days, the court also set an expert disclosure date just 6 business days away. (1-ER-63, 65). Authorizing an expert a defendant cannot communicate with is an effective denial. *Cf. McWilliams v. Dunn*, 582 U.S. 183, 199 (2017) (expert *examination* does not fulfill requirement of expert *assistance*).

Third, the district court's statement that Garg had a "meaningful opportunity" to confer with his expert (1-SER-55-56) was not only unsupported by any facts, but also irreconcilable with the court's determination just three weeks earlier that he had not. (1-ER-62-63). Even the government does not defend the court's suggestion that, somehow, between the court's February 15, 2024, order and its February 26, 2024, deadline, Garg had a meaningful opportunity to prepare a defense against the technical case the government had required months to assemble. Instead, the government argues that "Garg's failure to confer with an expert between November 2022 and February 2024 was largely of his own making." (Answer 76).

37

This argument fails. The government's claim that, after the court asked standby counsel to identify a computer expert who could assist Garg with the preparation of his defense, "three months passed with no apparent action by Garg" is refuted by the signed declaration of standby counsel detailing his active search for an expert. (FER-4-8). When Garg sought to have the expert that standby counsel had located appointed, the court "denie[d] his request for a second expert" because "previous counsel hired a computer expert, who presumably performed a detailed analysis of the devices at issue." (1-ER-49). The court made this finding notwithstanding the fact that the prior expert refused to work with a pro se defendant. (11-ExParteER-2245; FER-6).

After Garg obtained some funding in June 2023, the problems with getting a phone call began. (6-ER-1258-1261; 6-ER-1273-87, 6-ER-1305-14). In November 2023—a full year after the court ordered BOP to facilitate defense witness calls—when Garg asked about contacting his expert, BOP's unit team told Garg, "As for your expert, have you tried emailing him or sending him letters? That's the only form of communication I can think of besides him visiting the facility." (6-ER-1314). Garg's standby counsel wrote to BOP counsel (copying the AUSA): "The system you outlined below for Mr. Garg to reach his expert has been routinely denied by the FDC." (6-ER-1285).

The government's claim that BOP "scheduled a call" for December 11 that Garg's expert "would not make himself available" for (Answer

38

80) inverts the record. BOP never coordinated with the expert. After standby counsel asked to be notified when the expert was added to the call list "so we can do a test call," BOP instead unilaterally "set a trial call for 12/11/2023 @ 9:00 AM," adding only: "Please let me know if Gus is not available at that time." (6-ER-1284). The expert was not available then. (6-ER-1283). That is not BOP complying with the court's order; it is BOP setting an appointment without consulting either party. BOP then briefly indicated the expert would be added to the CJA phone line before reversing course and reinstating the email-the-unit-team process that standby counsel and Garg's paralegal had already documented as non-functional. (6-ER-1283; 6-ER-1287). Garg's inability to speak to his expert was not "of his own making."

Fourth, the government's reliance on *United States v. Sarno*, 73 F.3d 1470 (9th Cir. 1995) (Answer 75), confirms the constitutional deficiency here. *Sarno* held that 120-140 hours of law-library access and 20 hours of discovery review satisfied the Sixth Amendment because the defendant had been given access—limited by institutional constraints, but real. *Id.* at 1491. The case stands for the proposition that "an incarcerated defendant may not meaningfully exercise his right to represent himself without access to law books, witnesses, or other tools to prepare a defense." *Id.* (quoting *Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir. 1985)). The point of *Sarno* is access; its balancing test addresses how much access is enough. It does not authorize no access.

39

Here, the only person permitted to receive the digital discovery was a computer expert (1-ER-29; 5-ER-900; 6-ER-1226, 1256), and Garg was prevented from speaking with that expert. Counting law-library hours and photocopies (Answer 74) does not substitute for access to the one resource indispensable to the defense.

And fifth, the harm from this deprivation was not theoretical. Of the approximately 50 email addresses used for the stalking activity, the government was able to map the creation of only six to a specific device, and all those were mapped to the single device Hefton turned over to the authorities months after Garg was arrested. (5-SER-1152-53). Hefton's other devices were wiped, and Hutchins's and Gonzalez's devices were not examined. (3-SER-734-36, 5-SER-1153-54, 1276-77). The government's expert witnesses, Hansen and Wood, both acknowledged that they did only what the government asked them to do—which was to build the government's case against Garg. (5-SER-1131-32; 5-SER-1259-1260).

In an Ex Parte Offer of Proof to Preserve a Claim of Error Due to Denial of Computer Expert Testimony (11-ExParteER-2297-2351), Garg identified six concrete defense theories an expert was needed to develop, each grounded in trial-record concessions by the government's own witnesses:

-



These were not speculative theories. Each rested on trial-record concessions by the government's own witnesses. An expert could have synthesized those concessions into a coherent third-party-culpability

defense and challenged the government's forensic case. Garg was denied any meaningful opportunity to consult one. The denial of the *Faretta* right is structural. But, even on the government's terms, the offer of proof shows how the court's rulings prevented Garg from meaningfully defending himself.

## III. The district court's clearly erroneous factual finding requires reversal of the plea-offer ruling.

### A. The district court's finding is directly contradicted by the document it cites.

The plea-offer issue can be resolved on a single point the government does not dispute. The district court found both the deficient performance and the prejudice prongs of *Strickland v. Washington*, 466 U.S. 668 (1984), unsatisfied based on its finding that Camiel "sent Defendant a letter stating this exact opinion"—that Garg's post-trial range would be 210-262 months. (1-ER-72, 72-73). The court cited one exhibit for both findings: Camiel's February 23, 2022, letter at Dkt. No. 819-2 at 6 (10-SealedER-2019). That letter says the range would be 70-87 months, not 210-262. The government acknowledges that the court "made a mistake in describing what Camiel wrote in the February letter." (Answer 89-90). The question is whether a finding directly contradicted by the only document cited to support it can survive clear-error review. It cannot.

42

The government concedes the court's citation was wrong but asks this Court to treat it as a mere "mistake in describing what Camiel wrote in the February letter (as opposed to communicated orally during an ensuing in-person meeting)," invoking the deferential clear-error standards of *United States v. Gust*, 405 F.3d 797, 799 (9th Cir. 2005), and *United States v. Bissell*, 504 F.3d 956, 962 (9th Cir. 2007). (Answer 89-91). Those standards do not rescue a finding that is contradicted by the document the court relied on. The district court specifically found Camiel "sent Defendant a letter stating this exact opinion," and "could not have been clearer in articulating this exact opinion" (1-ER-72, 73). The cited letter says the opposite. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc), defines as clearly erroneous a finding that is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." The court's finding that the February 2022 letter "stat[es]" a 210-262-month opinion, when the letter actually states a 70-87-month opinion, is all three.

The government's fallback—that Camiel's declaration describes an oral communication about 210-262 months—raises a disputed factual question the district court never resolved. The court did not weigh Camiel's declaration against Garg's contrary statements. It rested its finding on documentary evidence that contradicts its conclusion. This Court cannot substitute its own credibility determination; it must remand for an evidentiary hearing.

43

## B. The documentary record corroborates Garg, not Camiel.

The government contends that, other than this direct contradiction, Garg's argument "rests on a purported lack of evidence." (Answer 92). Actually, Garg's argument rests on the record corroborating Garg, not Camiel.

The district court ordered Camiel to produce "all documents advising, or reflecting, Mr. Camiel's advice to Defendant concerning the Sentencing Guidelines calculation and range." (7-ER-1596). The resulting record contains scores of notes, emails, and letters—not one of which, from before August 10, 2022, mentions a range exceeding 108 months.

Although the government leans on Camiel's declaration that he showed Garg the Guidelines manual table showing 210-262 in person "months earlier," that statement is irreconcilable with the record. Camiel wrote a letter on August 1, 2022, for the express purpose of "creat[ing] a record of [his] advice to Mr. Garg," but it does not contain the 210-262 figure or any number in that vicinity. If Camiel had genuinely identified the 210-262 range for Garg on the sentencing table, that figure would surely have appeared in the August 1 record-creating letter. Its absence is more probative than any after-the-fact declaration.

Moreover, although the government argues that Camiel's failure at the October 13, 2022, hearing to dispute Garg's statement that he

44

had "recently learned the range exceeded 120 months" was "unsurprising" because the hearing wasn't about ineffectiveness (Answer 92), this ignores that Camiel was present, was speaking, and did contradict Garg on other points (e.g., on whether the discovery problem was the cause of Garg's reluctance to plead). His silence on the central factual claim is meaningful precisely because he wasn't silent generally.

### C. The government's "buyer's remorse" narrative misreads the record.

The government contends that the reason Garg wanted the plea reinstated is because he learned that the forensic evidence was damning. (Answer 83, 87, 94). As an argument that Garg cannot show prejudice from Camiel's deficient performance, the contention fails for three reasons.

First, the government's narrative is contradicted by Camiel's own statements at the October 13, 2022, hearing on his motion to withdraw. The government wants this Court to credit Camiel's after-the-fact declaration—that he had told Garg in early 2022 his post-trial range was 210-262 months—while disregarding Camiel's contemporaneous statements at that hearing. Camiel told the magistrate judge that Garg's inability to review the evidence was not driving his plea decisions; according to Camiel, Garg had been hoping the offers would get better, but they had not. (11-ExParteER-2224). And when Garg told

45

the magistrate judge that Camiel had "just in the past three, four days" advised him his range now exceeded 120 months—far beyond the 87-108 figure on which Garg had been relying—Camiel did not dispute it. (11-ExParteER-2218 (per Corrigendum, 11-ExParteER-2234)). Camiel's silence is meaningful: if Camiel had walked Garg through a 210-262-month range months earlier, the moment Garg told the magistrate judge that he had only just learned his range exceeded 120 months was the moment to correct him. The government cannot credit Camiel's later declaration while disregarding his contemporaneous statements at the very hearing where the issue was raised.

Second, the timeline of the plea negotiations is fatal to the buyer's-remorse framing. Garg rejected the 48-month offer on August 10. (10-SealedER-2060). On August 31, the government disclosed what it described as "irrefutable digital evidence" of Garg's guilt. (10-SealedER-2067). At that point, on the government's own theory, the variable it identifies as decisive—the strength of the evidence—was revealed. Yet on September 12, Garg rejected the government's new 60-month offer. (10-SealedER-2150). If evidence revelation had been the cause of Garg's renewed interest in pleading, he would have accepted a deal capped at five years once the evidence picture was clear. He did not. He asked for the 48-month deal back, was told no, and then rejected the 60-month alternative. That pattern is consistent with a defendant who believed his post-trial guideline range was 87-108 months—and therefore that

even a five-year deal was worse than the trial outcome he expected. It is not consistent with a defendant who had been told his range was 168-210 or 210-262.

Third, the plea chronology is more complex than buyer's remorse. In early August, when Garg believed the evidence to be weak and his guidelines to be low, he rejected a 48-month offer. In early September, after the August 31 disclosure, Garg now believed the evidence to be strong, but he still believed his guidelines were 87-108; and so, when the 48-month offer was no longer available, he rejected the substitute 60-month offer. In October, when Camiel finally told him his range exceeded 120 months, his position changed: he told the magistrate judge he would "take the four right now." (11-ExParteER-2223 (per Corrigendum, 11-ExParteER-2234)). The only variable that changed between September and October was Garg's understanding of his sentencing exposure. That is what *Lafler v. Cooper*, 566 U.S. 156 (2012), protects: the right to make an informed plea decision based on accurate sentencing advice. And, as precedent holds, the disparity between the 48-month offer and the 168-210-month range is itself objective evidence of prejudice. *United States v. Gordon*, 156 F.3d 376, 381 (2d Cir. 1998); *Garcia v. Runnels*, 2004 WL 1465696, at *4 (N.D. Cal. 2004), aff'd, 143 F.App'x 38 (9th Cir. 2005).

The government urges this Court to affirm the district court's finding that "there was 'no reasonable probability' that any additional

47

advice Camiel might have given Garg about his sentencing exposure 'would have led him to accept the Government's plea proposals.'" (Answer 95 (quoting 1-ER-72)). Recall that the only written advice the district court cited in its order stated: "If you are convicted of charges involving 5 victims your range will be 70-87 months." (10-SealedER-2019). As explained in Garg's Opening Brief, Garg had a reasonable belief that he could receive a 48-month sentence even if his advisory range was 70-87 months, or 87-108. (8-ER-1824). An advisory range of 168-210 (or as Camiel claims he advised Garg, 210-262) is an entirely different picture. The government's argument that Garg would have rejected even accurate advice (Answer 93) assumes the very fact in dispute: what Camiel told Garg before August 10.

The district court's denial of Garg's motion to reinstate was based on a clearly erroneous factual determination. Remand is required.

## IV. Reversal is required for instructional error.

### D. The jury instructions permitted conviction based on protected speech.

This instructional claim is preserved: Garg proposed a true-threat instruction, and the district court refused it. (1-ER-74, 78-97, 87-88). Review is de novo. *United States v. Woodberry*, 987 F.3d 1231, 1234 (9th Cir. 2021). The government has waived any argument that the error was harmless beyond a reasonable doubt. *United States v. Rodriguez,*

880 F.3d 1151, 1163 (9th Cir. 2018). Because the instructions were legally erroneous, reversal is required.

### 1. The government does not argue that the instructions complied with *Counterman.*

The instructions were legally erroneous because they permitted Garg to be convicted based on protected speech. *United States v. Cassel,* 408 F.3d 622, 635-36 (9th Cir. 2005). The government argued to the jury that the emails (that is, speech) comprised the "course of conduct" that violated 18 U.S.C. § 2261A (6-SER-1420-24, 1426-27), and the instructions given did not limit the basis of conviction to unprotected speech (1-ER-94). Post-trial, the government argued and the district court held that the instructions complied with *Counterman* because they instructed the jury that "the defendant intended to harass or intimidate a person." (FER-225-26; 1-ER-107).

The government does not press on appeal the argument it made below—that the instructions complied with *Counterman*—and has waived it. *Houston v. Maricopa,* 116 F.4th 935, 942 n.6 (9th Cir. 2024). The instructions clearly do not comply with *Counterman*, which requires that, when a prosecution is based on threatening speech, the speech constitute a "true threat." (AOB 65-69).

Other circuits have applied that requirement to § 2261A(2) itself, confirming that when a cyberstalking conviction rests on a defendant's communications, the government must prove a true threat. See *United*

*States v. Dennis*, 132 F.4th 214, 228-30 (2d Cir. 2025) (§ 2261A(2)(B) requires proof of a true threat as to both intent and causation); *United States v. Sryniawski*, 48 F.4th 583, 587 (8th Cir. 2022) (government must prove intent to "harass" or "intimidate" "in a sense that is not protected under the First Amendment," such as a true threat). The instructions, as given, did not impose this requirement. (1-ER-94, 96; AOB 68-69). As noted, the government does not argue otherwise.

### 2.     *Osinger* does not foreclose the claim.

Instead, the government argues that this was not a true-threats prosecution at all, but rather a conduct-based prosecution, and thus that the jury did not need to be instructed on the limitations for a speech-based prosecution. For this proposition, the government turns to this Court's 2014 decision in *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014) (Answer 96-97). The government's argument fails for three reasons.

First, *Osinger* was not a jury-instructions case. *Osinger* considered a facial overbreadth and vagueness challenge to the 2010 version of § 2261A(2)(A)[8] and an as-applied challenge to the statute. *Osinger*, 753 F.3d at 940-44, 946-47. Garg presents neither. Garg challenges the jury instructions, which permitted conviction without the constitutional findings *Counterman* requires. Whether the instructions satisfied the

_____

[8] The prior version of the statute at issue in *Osinger*, effective January 5, 2006-September 30, 2013, is quoted in 753 F.3d at 943 n.1.

50

First Amendment after *Counterman v. Colorado,* 600 U.S. 66 (2023), was not the question in *Osinger.* Nor could it have been, given *Osinger* was decided nine years before *Counterman.*

Second, *Osinger*'s as-applied holding rested on the integral-to-criminal-conduct exception. 753 F.3d at 946-47. Judge Watford, joining the judgment, wrote separately to explain that, although the precise scope of the integral-to-criminal-conduct exception was unsettled, "it surely applies when the defendant commits an offense by engaging in both speech and non-speech conduct, and the sole objective of the speech is to facilitate the defendant's criminal behavior." *Id.* at 950. There, the criminal non-speech behavior consisted of repeated unwanted in-person visits to V.B's home and workplace in Illinois before she relocated. *Id.* at 952.

But the jury here was not instructed to find that the sole objective of the offensive speech was to facilitate non-speech criminal conduct, or even that any communications had to be tethered to such conduct. The government argued that the criminal conduct at issue was speech (6-SER-1420-24, 1426-27). And the jury instructions permitted it to convict on a course of communicative conduct alone—text messages, emails, online posts—provided only that Garg "intended to harass or intimidate" and that the conduct "would be reasonably expected to cause substantial emotional distress." (1-ER-94, 96). *Osinger* does not decide the constitutionality of an instruction that allows conviction on

51

that basis. The two post-*Counterman* decisions the government cites (Answer 97-99) are not precedent. 9th Cir. R. 36-3.

Third, to the extent the government reads *Osinger* more broadly— to treat any communication that meets § 2261A(2)'s statutory definition as categorically outside the First Amendment because the statute defines such communication as criminal—that reading cannot stand. The integral-to-criminal-conduct exception reaches only speech that solicits or facilitates conduct independently criminal. *United States v. Hansen*, 599 U.S. 762, 783-84 (2023); *cf. Chiles v. Salazar*, 146 S. Ct. 1010, 1026 (2026) (speech integral-to-criminal-conduct is speech "bound up with traditional criminal conduct"). It does not allow the government to bootstrap any speech statute into a First Amendment exemption. Citing *Hansen*, this Court has explained that to qualify as speech "integral to unlawful conduct," the speech must be done in furtherance of the commission of an independent criminal offense. *Matsumoto v. Labrador*, 122 F.4th 787, 813-14 (9th Cir. 2024). "Labeling protected speech as criminal speech cannot, by itself, make that speech integral to criminal conduct." *Id.* at 814.

The Eighth Circuit applied the same principle to § 2261A(2): "Congress may not define speech as a crime, and then render the speech unprotected by the First Amendment merely because it is integral to speech that Congress has criminalized." *Sryniawski*, 48 F.4th at 588. The government cannot bypass the true-threat requirement by invoking

the integral-to-conduct theory *Chiles, Hansen,* and *Matsumoto* confine. To the extent *Osinger* could be read to license the broader reading, that reading would be clearly irreconcilable with *Hansen* and would not bind this panel. *Miller v. Gammie,* 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

### E. The Counts 2-4 instructional error was preserved and prejudicial.

The government argues plain-error review applies to Garg's challenge to the Counts 2-4 instruction. (Answer 100). But Garg proposed an instruction requiring the jury to find the "offense" was committed in violation of the protection order. (1-ER-77). Garg, a pro se litigant, having proposed a correct instruction, should not be punished with plain error review simply because he failed to say the words "I object." *Chess v. Dovey,* 790 F.3d 961, 971 (9th Cir. 2015).

In any event, the statutory text is unambiguous. Section 2261(b)(6) requires "the crime of stalking in violation of" a protection order. The "crime of stalking" under § 2261A requires a "course of conduct"—defined as "2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). The statute requires two or more post-order acts. But, as instructed, the jury needed to find only "conduct"— i.e., a single act—violating the order. Because the indictment alleged courses of conduct beginning months before the November 10 no-contact

53

order, the instruction permitted conviction based on a single post-order act supplementing months of pre-order conduct.

The government does not dispute this statutory interpretation; it argues only harmlessness. The harmlessness inquiry asks whether a properly instructed jury would have made the required findings, not whether there is record evidence that could support them. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("The inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."). The government cannot show harmlessness beyond a reasonable doubt without knowing what the jury found.

## V.   Count 8 must be dismissed.

The government invokes the abuse-of-discretion standard for review of denials of Rule 12 waiver exceptions. (Answer 102). But there is no such denial here to defer to. The district court did not deny Garg's motion to reinstate, did not strike it as untimely, and did not rule that good cause was lacking.[9] It did not rule at all. The motion was

---

[9] The government argues in a footnote that Garg never invoked *Counterman* as good cause for his untimely motion. (Answer 103 n.23). The record refutes that. Garg's July 17, 2023 motion to reinstate his motion to dismiss Count 8 expressly identified *Counterman* as the reason for reinstatement: he stated that *Counterman* has "significant role in my reply" to the government's opposition, that he "need[ed] this case to draft Jury instructions," and that the parties would "wrestle

terminated, without resolution, after trial. (9-ER-1979). Abuse-of-discretion review presupposes an exercise of discretion. Silence on a timely-filed motion squarely raising an intervening Supreme Court decision is not an exercise of discretion. *Cf. United States v. Mancinas-Flores*, 588 F.3d 677, 683-84 (9th Cir. 2009).

That silence reinforces the structural concern from Issue II: The motion to dismiss Count 8 was a defense motion Garg was constitutionally entitled to make, and the district court's failure even to rule on it underscores the broader pattern of treating Garg's pro se filings as litigation noise rather than constitutional advocacy.

On the merits, the government's argument on Count 8 depends entirely on its *Osinger* argument. For the reasons stated in Argument IV.A., that is not correct. Applying the true-threat requirement, as the Second Circuit did in *Dennis*, to Count 8's allegations, the alleged conduct—two emails, one a forwarded message originally directed at others and one with the subject line "KING COUNTY PROSECUTORS BEGGING FOR MERCY"—did not convey a serious expression of an intent to commit an act of unlawful violence. *Dennis*, 132 F.4th at 233-35; *accord United States v. Bagdasarian*, 652 F.3d 1113, 1119 (9th Cir.

---

over true threat definition and burden of proof." (9-ER-1867-68). That is a good-cause invocation in substance, particularly under the rule that pro se filings are construed liberally. *United States v. Qazi*, 975 F.3d 989, 992-93 (9th Cir. 2020).

2011) (profanities predicting that Obama would be shot or exhorting others to shoot him were not "true threats").

Moreover, even under *Osinger*'s framework, Count 8's specific allegations do not allege a criminal course of harassment. As explained above, *Osinger* involved in-person criminal harassment consisting of repeated unwanted in-person visits to V.B's home and workplace in Illinois before she relocated. 753 F.3d at 952. Here, Count 8 did not allege any sort of non-speech conduct with respect to Gary Ernsdorff, a King County Prosecutor.

Because the allegations in Count 8 were insufficient as a matter of law, the district court erred in refusing to consider Garg's motion. Count 8 must be dismissed and the matter remanded for resentencing. *United States v. Christensen*, 828 F.3d 763, 821 (9th Cir. 2015) (describing "customary practice" of remanding for resentencing on all counts that formed part of the "sentencing package").

56

## Conclusion

For the foregoing reasons, this Court should dismiss Count 8, reverse all other counts, and remand.

Respectfully submitted,

DATED: June 1, 2026

*s/ Davina T. Chen*

DAVINA T. CHEN
*Attorney for Defendant-Appellant*
*Sumit Garg*

57

## Certificate of Compliance

This brief contains 11,192 words, excluding the items exempted by Fed. R. App. P. 32(f). A motion to exceed word length is concurrently filed. (This Court, by order dated March 18, 2026 (Dkt. 43), gave appellant leave to file a brief up to 10,000 words).

DATED: June 1, 2026

s/ Davina T. Chen

DAVINA T. CHEN